FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CHAD ALAN LEE,

*Petitioner-Appellant*,

v.

RYAN THORNELL,

*Respondent-Appellee*.

No.09-99002

D.C. No.
2:01-CV-02178-
EHC

OPINION

Appeal from the United States District Court
for the District of Arizona
Earl H. Carroll, District Judge, Presiding

Argued and Submitted November 14, 2023
San Francisco, California

Filed June 11, 2024

Before: Consuelo M. Callahan, Jacqueline H. Nguyen, and
Daniel A. Bress, Circuit Judges.

Opinion by Judge Bress

# SUMMARY[*]

## Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of Chad Lee's 28 U.S.C. § 2254 habeas corpus petition, and the denial of Lee's motion for leave to amend, in a case in which Lee was convicted and sentenced to death for three murders.

In Claim 2, Lee argued that his trial counsel was constitutionally ineffective at sentencing because he failed to investigate and present mitigating evidence that Lee suffered from Fetal Alcohol Syndrome and Fetal Alcohol Effect. He maintained that his *in utero* exposure to alcohol caused organic brain damage, a substantial mitigating factor. Because Lee did not raise this claim in his postconviction relief petition, it is procedurally defaulted. The evidence that Lee would bring forward to establish cause and prejudice, as well as the underlying ineffective assistance of trial counsel claim, was not developed in the state court proceedings. Lee assigned further error to the district court's failure to hold an evidentiary hearing to further develop these facts.

Lee offered two novel theories for obtaining a federal evidentiary hearing notwithstanding 28 U.S.C. § 2254(e)(2), which places strict limits on when federal courts can hold evidentiary hearings and consider new evidence when the habeas petitioner has failed to develop the factual basis for his claim in state court proceedings. The panel held that (1) Lee's theory based on his alleged abandonment by state postconviction counsel lacks merit; (2) Lee's theory—that

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the Arizona Supreme Court did not follow a "meaningful process" when it appointed postconviction counsel, such that the requirements of § 2254(e)(2) do not apply—also fails; and (3) Lee's two theories also do not provide "cause" to excuse his failure to raise his ineffective assistance claim in state postconviction proceedings.

The panel held that even if Lee could demonstrate cause to excuse the procedural default, Lee cannot demonstrate prejudice. Lee's prejudice argument depended on the new evidence of alleged organic brain damage from fetal alcohol exposure that Lee did not put forward in state court, and § 2254(e)(2) prevents federal courts from considering that evidence. Lee did not argue that, absent his new evidence, he can demonstrate ineffective assistance of trial counsel for failure to investigate and present fetal-alcohol evidence at sentencing. His ineffective assistance claim necessarily fails, and he cannot show prejudice to excuse his procedural default. But even considering Lee's new theory and evidence, Lee still cannot show prejudice because his underlying ineffective assistance claim lacks merit. That is, because Lee can show neither that his trial counsel performed deficiently nor that his alleged deficient performance prejudiced him, Lee cannot demonstrate prejudice from postconviction counsel's failure to raise the fetal alcohol ineffective assistance theory in state postconviction proceedings.

In Proposed Claim 26, Lee asserted that the Arizona Supreme Court erred on direct appeal by unconstitutionally requiring him to establish a causal nexus between his crimes and his mitigating evidence. The panel held that the district court correctly denied leave to add this claim because it was untimely under 28 U.S.C. § 2244(d)(1). The panel rejected Lee's argument that Proposed Claim 26 shared a common

core of operative facts with Claim 19, which argued that Arizona's capital sentencing scheme is unconstitutionally overbroad. The panel held that even if it were timely, Proposed Claim 26 is procedurally defaulted. The panel held that Proposed Claim 26 also fails on the merits because the Arizona Supreme Court did not apply an unconstitutional causal nexus test, and Lee cannot in any event show prejudice.

## COUNSEL

Timothy M. Gabrielsen (argued), Assistant Federal Public Defender; Jon M. Sands, Federal Public Defender, District of Arizona; Federal Public Defender's Office, Tucson, Arizona; for Petitioner-Appellant.

Jason D. Lewis (argued), David E. Ahl and Andrew S. Reilly, Assistant Attorneys General, Capital Litigation Section; Jeffrey L. Sparks, Deputy Solicitor General, Capital Litigation Chief; Kristin K. Mays, Arizona Attorney General; Office of the Arizona Attorney General, Phoenix, Arizona; for Respondent-Appellee.

## OPINION

BRESS, Circuit Judge:

In April 1992, Chad Lee killed three people in three weeks. He was sentenced to death for each murder. The Arizona Supreme Court affirmed Lee's convictions and sentence on direct appeal and denied his petitions for state postconviction relief. Lee then sought federal habeas relief under 28 U.S.C. § 2254, which the district court denied. We affirm.

I

A

We describe the facts of Lee's offenses, drawing largely from the Arizona Supreme Court's decisions on direct appeal. *State v. Lee*, 944 P.2d 1204, 1209 (Ariz. 1997) (*Lee I*); *State v. Lee*, 944 P.2d 1222, 1226 (Ariz. 1997) (*Lee II*).

On April 6, 1992, Lee, then 19 years old, and his accomplice, David Hunt, age 14, called Pizza Hut from a pay phone and ordered a pizza delivered to a vacant house. When Linda Reynolds arrived with the pizza, Lee and Hunt pointed a rifle at her and forced her to remove her shorts and shirt. The two put Reynolds in Lee's car, and Lee drove her into the desert. Hunt drove Reynolds's car to meet them.

Once in the desert, Lee and Hunt removed Reynolds's car stereo, smashed the windows and other parts of her car with a bat, punctured the tires, cut various hoses and wires to disable the engine, and shot a bullet through the hood. Lee later testified that he destroyed Reynolds's car to prevent her from escaping.

Lee and Hunt forced Reynolds to remove her shoes, socks, and pantyhose and to walk barefoot into the desert. Hunt then raped her, and Lee forced Reyolds to perform oral sex on him. After finding Reynolds's bank card in her wallet, Lee drove Reynolds and Hunt to an ATM. Lee gave Reynolds his flannel shirt to wear and then forced Reynolds to withdraw $20 of the $27 she had left in her account.

From there, Lee and Hunt drove Reynolds back into the desert. Reynolds tried to escape, but Hunt forced her back to the car. By the time she was returned to the car, her face and lips were bloody. According to Lee, Lee and Hunt argued in front of Reynolds over whether to kill her, and Reynolds "freaked" and tried to grab the gun.

Lee shot Reynolds once in the head. But Reynolds was still alive. Lee retrieved a knife from his car and twice stabbed Reynolds in the chest to "put her out of her misery." Lee and Hunt then drove away. Medical evidence indicated that Reynolds "would have been alive for at least a couple minutes, and probably more," following the stabbings. The next day, Lee pawned Reynolds's car stereo, wedding ring, and gold ring for a total of $170.

Ten days later, on April 16, 1992 around midnight, Lee used another payphone to call a taxi. David Lacey was dispatched to pick up Lee. Meanwhile, Hunt drove Lee's car to the location where Lee and Hunt planned to rob the driver. When Lacey arrived, Lee pulled out a revolver and demanded money. According to Lee, Lacey attempted to grab the gun. Lee then fired nine shots, four of which hit Lacey. Lee took "forty dollars from Lacey's pockets and dumped his body by the side of the road." Lee then drove Lacey's cab to a dirt road, where he searched the cab's contents and shot its windows and tires.

On April 27, 1992, Lee entered a convenience store around 1:00 a.m. to purchase cigarettes. When Harold Drury, the store clerk, opened the cash drawer, Lee shot Drury in the shoulder, causing Drury to fall backwards. Lee then "shot Drury in the top of the head, the forehead, the cheek, and the neck." After Drury slumped to the floor, Lee "walked around the counter and shot Drury two more times in the right temple." Lee retrieved the cigarettes and took the cash drawer before leaving the store. Hunt was waiting in Lee's car, and they left together.

## B

Not long after, in May 1992, police apprehended Lee and Hunt after various pieces of physical evidence connected them to the murders. *Lee I*, 944 P.2d at 1210. As to Linda Reynolds, Lee was indicted for first-degree murder, kidnapping, two counts of sexual assault, armed robbery, and theft. *Id.* at 1211. Lee was also indicted for the first-degree murders and armed robberies of David Lacey and Harold Drury. *Id.* Lee was tried in the Superior Court of Maricopa County in 1994. The trial court severed the counts involving Reynolds and Lacey (*Lee I*) from the counts involving Drury (*Lee II*). *Lee II*, 944 P.2d at 1226.

To prepare for a possible capital sentencing, Lee's trial counsel, Alan Simpson, applied for funds to hire Dr. Mickey McMahon, a clinical psychologist. When doing so, Simpson flagged Lee's deprived childhood and evidence of Lee's psychological and cognitive defects. Simpson specifically noted that Lee's sister's "strongest memory of her mother was sitting in a chair, a beer and cigarette in one hand, a book in another."

Simpson did other work to investigate mitigating circumstances, as well. Simpson obtained Lee's school

records, which indicated that at the time Lee dropped out in the ninth grade, he had a cumulative GPA of 1.20. Based on "[p]reliminary discussions with Dr. McMahon," Simpson "believe[d] that [Lee's] background contributed to the development of . . . recognized psychological and cognitive defects over which [Lee] had no control." A letter written to Simpson by his investigator, Ed Aitken, indicates that both Simpson and Aitken suspected early on that Lee may have suffered from "alcohol syndrome." As we discuss in greater detail below, however, Dr. McMahon did not believe that Lee suffered from such a syndrome.

In the *Lee I* trial, Lee was convicted of all charged offenses, including two counts of first-degree murder for the killings of Reynolds and Lacey. 944 P.2d at 1211. During sentencing proceedings, Dr. McMahon provided extensive testimony to establish a mitigating portrait of Lee based on his troubled family background, "follower" personality, age, and mental shortcomings.

Dr. McMahon described the parental abandonment that Lee suffered during his early childhood and its severe consequences for Lee's adolescent development. Dr. McMahon also testified that Lee suffered from attention deficit disorder. To demonstrate that Lee was "a dependent kind of person" and "submissive," Dr. McMahon testified about the results of a personality test that he administered to Lee, indicating that on a scale of 1.0 (non-leader) to 10.0 (leader), Lee scored a 1.1. According to Dr. McMahon, Lee experienced "times when his ability to perceive reality is significantly compromised." As a result, Lee would sometimes "not appreciate the total impact of the situation he is in and how it affects him and the people around him."

In *Lee I*, the trial court sentenced Lee to consecutive, aggravated terms of imprisonment totaling 101 years for the noncapital convictions. *Lee I*, 944 P.2d at 1211. For each of the murders, and operating pre-*Ring v. Arizona*, 536 U.S. 584 (2002), the court sentenced Lee to death. *Id.* The trial court found the following aggravating circumstances for both death sentences: previous death-eligible conviction, previous violent felony, and pecuniary gain. *Id.* In addition, the court found that the Reynolds murder was especially cruel, heinous, and depraved. *Id.* As mitigating factors, the trial court acknowledged "defendant's age, lack of significant prior criminal history, deprived childhood, cooperation with law enforcement officials and assistance in recovery of weapons, and remorse." *Id.*

In the *Lee II* trial, a unanimous jury found Lee guilty of felony murder and premeditated murder. *Lee II*, 944 P.2d at 1226. After considering the same mitigating evidence presented in *Lee I*, the trial court sentenced Lee to death for the murder and a consecutive 21-year term for the armed robbery. *Id.* The court found four statutory aggravating circumstances for the death sentence: previous death-eligible convictions for the Reynolds and Lacey murders, previous violent felonies, pecuniary gain, and offense committed in an especially cruel, heinous, or depraved manner. *Id.* at 1227. The trial court found Lee's "age, lack of significant prior criminal history, and deprived childhood to be mitigating circumstances." *Id.*

The Arizona Supreme Court affirmed Lee's convictions and sentences in two separate opinions. *Lee I*, 944 P.2d 1204; *Lee II*, 944 P.2d 1222. The court "independently reviewed and weighed the aggravating and mitigating circumstances" related to each murder. *Lee II*, 944 P.2d at 1233–34; *see also Lee I*, 944 P.2d at 1221. As to the Drury

murder, the court found that "the state proved the following aggravation beyond a reasonable doubt: (a) previous death-eligible conviction, (b) previous violent felony, (c) pecuniary gain, and (d) that the murder was committed in an especially heinous and depraved manner." *Lee II*, 944 P.2d at 1234. It also found that Lee "proved the following mitigation by a preponderance of the evidence: (a) age, (b) lack of significant prior criminal history, and (c) deprived childhood." *Id.* As to the Reynolds murder, the Arizona Supreme Court found the same aggravating and mitigating factors, with the additional mitigating factors of "cooperation with law enforcement officials" and "remorse." *Lee I*, 944 P.2d at 1211. The court found that all these aggravating and mitigating factors applied to the Lacey murder, except that the Lacey murder was not depraved. *Id.* at 1220.

The U.S. Supreme Court denied Lee's petition for certiorari in March 1998.

C

In Lee's state postconviction proceedings, the Arizona Supreme Court appointed attorney Jess Lorona to represent Lee. Lorona investigated Lee's case in preparation for filing Lee's petition for state postconviction relief. Lorona contacted Lee's trial counsel, Simpson, and obtained documents from him. Lorona's billing records indicate that Lorona also contacted the attorneys who represented Lee on direct appeal.

Lee wrote two letters to Lorona requesting status updates. Lorona responded on March 8, 2000, and April 13, 2000. In the first letter, Lorona informed Lee that Lorona had obtained an extension for filing the petition for postconviction relief and noted that Lorona and his

investigator had been interviewing witnesses and working on the case. The second letter reiterated that Lorona and his investigator had been interviewing witnesses, enclosing a copy of the filed petition for postconviction relief, which Lorona had submitted on March 15, 2000.

Lorona dedicated most of the postconviction petition to arguing that Arizona's death penalty scheme was unconstitutional. Lorona also argued that the trial court had erred in different respects, such as in not severing the trials for the Reynolds and Lacey murders. Although Lorona did also assert five claims of ineffective assistance of trial counsel, he did not raise the ineffective assistance claim at issue here, which pertains to Simpson's alleged failure to investigate and present mitigating evidence of Fetal Alcohol Syndrome.

In response to Lorona's petition, the State argued that the non-ineffective assistance of trial counsel claims were precluded because they were either decided on direct appeal or could have been raised at that time. As to the ineffective assistance claims, the State maintained that Lee had "failed to raise any colorable claims," so the State "request[ed] that [Lee] be ordered to file an amended petition within 30 days, in order to explain how his [ineffective assistance] allegations . . . are colorable." Lorona did not amend the petition or file a reply, despite filing a motion for an extension of time.

The state trial court (the same judge who had presided over Lee's trials and sentenced him to death) denied Lee's petition for postconviction relief. The court agreed with the State that all the non-ineffective assistance claims were precluded because they were either raised or could have been raised on direct appeal. As to the ineffective assistance

claims, the court found that none were colorable, on that basis rejecting the State's assertion that Lee should have filed an amended petition. The court explained:

> First, based on the Court's observations in the pretrial stage, at trial, and finally at sentencing, Defendant received an excellent defense from a very competent and experienced attorney. Second, Defendant has not and cannot demonstrate prejudice. There is no need for an evidentiary hearing as to the allegations of ineffective assistance of trial counsel because Defendant cannot meet either of the two prongs set forth in *Strickland*.

The court noted that Lee's "counsel provided the Court with much evidence as to Defendant's deprived childhood and the Court considered it and counted it as a mitigating factor. The Court didn't have to have counsel 'draw a line' to show the nexus, but that childhood could not overcome the aggravating factors found by the Court in these homicides."

In a second postconviction petition filed in September 2005, Lee argued that the Arizona Supreme Court in *Lee I* improperly refused to consider Lee's mitigating evidence because it lacked a causal nexus to his crime. The state trial court rejected this "successive Notice of Post-Conviction Relief," finding that Arizona Rule of Criminal Procedure 32.2(a) precluded Lee from pursuing a claim that "should have been raised on direct appeal or in the first Rule 32 [postconviction] proceedings." The Arizona Supreme Court denied review. Lee also submitted a third petition for postconviction relief in 2009, which was likewise denied.

## D

On November 8, 2001, Lee filed two petitions for § 2254 relief in federal court. The petitions were consolidated. On March 3, 2003, Lee filed his first amended petition. Two claims are relevant here.

***Claim 2.*** Claim 2 focused on the performance of Lee's trial counsel, Simpson. It alleged that Simpson "provided constitutionally ineffective assistance of counsel by failing to investigate and prepare adequate and appropriate mitigation for the sentencing phases of [Lee's] two trials," specifically by failing to pursue counsel's suspicion that Lee "might have had neurological damage as a result of prenatal exposure to alcohol." In February 2005, the district court dismissed Claim 2, finding it procedurally defaulted because Lee had failed to raise this argument in state court.

***Proposed Claim 26.*** In July 2006, Lee sought to add to his § 2254 petition a proposed Claim 26, in which he asserted that the Arizona Supreme Court unconstitutionally required him to establish a causal nexus between his crimes and his mitigating evidence, in violation of *Tennard v. Dretke*, 542 U.S. 274 (2004). In November 2006, the district court denied the motion to amend because "add[ing] this claim would be futile because it is time barred, procedurally barred, and without merit."

In 2009, Lee appealed the denial of § 2254 relief. Shortly after appellate briefing was completed, the Supreme Court decided *Martinez v. Ryan*, 566 U.S. 1 (2012). In *Martinez*, the Court held that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id.* at 9. This court then granted Lee's motion for a limited remand to permit the

district court to reconsider its denial of Claim 2 and other claims in light of *Martinez*.

In his remand briefing in the district court, Lee supported Claim 2 with new evidence, including declarations from additional experts. These medical professionals discussed the evidence of Lee's alleged Fetal Alcohol Syndrome and Fetal Alcohol Effect—resulting from Lee's *in utero* exposure to alcohol—and the impact on Lee's brain development and maturity. Lee also included declarations from friends and family members about his difficult childhood.

The district court again denied all claims, including Claim 2. The court found that Simpson's performance was not deficient, and that even if it was, Lee was not prejudiced, meaning that Lee had not excused his procedural default. The court found that any evidence of fetal alcohol-related brain damage would not have affected Lee's sentence because of (1) Lee's "lead role in the murders and robberies"; (2) the strength of the aggravating factors; and (3) the state trial court's acceptance of other mitigating circumstances. The district court also denied Lee's requests for depositions of Simpson and Lorona and for an evidentiary hearing because it found the underlying claim to lack merit. The district court granted a certificate of appealability on Claim 2. It later admitted additional materials that Lee proffered into the record.

E

In August 2019, we expanded the certificate of appealability to include the question of whether the district court erred in denying leave for Lee to add his Proposed Claim 26, the causal nexus claim. We also ordered replacement briefs to be filed. In May 2021, we issued an

order holding the case in abeyance pending *Shinn v. Ramirez*, 596 U.S. 366 (2022). After *Shinn* was decided, the parties then filed a further round of replacement briefs.

We review de novo the district court's denial of Lee's § 2254 petition. *Cain v. Chappell*, 870 F.3d 1003, 1012 (9th Cir. 2017). The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) applies in this case because Lee's federal habeas petition was filed in 2001, after AEDPA's effective date. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).

## II

In Claim 2, Lee argues that his trial counsel, Alan Simpson, was constitutionally ineffective at sentencing because he failed to investigate and present mitigating evidence that Lee suffered from Fetal Alcohol Syndrome and Fetal Alcohol Effect. Lee maintains that his *in utero* exposure to alcohol caused organic brain damage, a substantial mitigating factor. To establish a Sixth Amendment claim of ineffective assistance under *Strickland v. Washington*, 466 U.S. 668 (1984), Lee must show that his trial counsel was deficient and that this deficient performance prejudiced Lee. *See, e.g.*, *Harrington v. Richter*, 562 U.S. 86, 104 (2011).

Because Lee did not raise this claim in his state postconviction relief petition, it is procedurally defaulted. *See Shinn*, 596 U.S. at 371 ("A federal habeas court generally may consider a state prisoner's federal claim only if he has first presented that claim to the state court in accordance with state procedures."). To enable a federal court to consider this claim, Lee must "demonstrate 'cause' to excuse the procedural defect and 'actual prejudice.'" *Id.* (citation omitted); *see also, e.g.*, *McLaughlin v. Oliver*, 95

F.4th 1239, 1246 (9th Cir. 2024).  However, the evidence that Lee would bring forward to establish cause and prejudice, as well as the underlying ineffective assistance of trial counsel claim, was not developed in the state court proceedings.  The district court also declined to hold an evidentiary hearing to further develop these facts, to which Lee assigns further error.

## A

The most immediate difficulty for Lee is 28 U.S.C. § 2254(e)(2), which places strict limits on when federal courts can hold evidentiary hearings and consider new evidence when the habeas petitioner has failed to develop the factual basis for his claim in state court proceedings.[1]  In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court held that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial."  *Id.* at 9.  This stands as a "narrow exception" to the usual rule that "in proceedings for which the Constitution does not guarantee the assistance of counsel at all, attorney error cannot provide cause to excuse a default."  *Shinn*, 596

---

[1] Under 28 U.S.C. § 2254(e)(2), "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that— (A) the claim relies on— (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."

U.S. at 380 (quoting *Davila v. Davis*, 582 U.S. 521, 529 (2017)).

In *Shinn*, however, the Supreme Court held that the special rule of *Martinez* did not create an exception to § 2254(e)(2) to excuse a habeas petitioner's failure to develop in state court proceedings evidence of trial counsel's ineffectiveness. 596 U.S. at 371. As *Shinn* now makes clear, even when "postconviction counsel negligently failed to develop the state-court record," a federal court "shall not hold an evidentiary hearing" unless one of the two exceptions in § 2254(e)(2) is met. *Id.* Under *Shinn*, "[b]ecause '§ 2254(e)(2) is a statute that the courts have no authority to amend,' its strictures must be enforced according to their terms, with no *Martinez*-style judge-made equitable exceptions for only 'a subset of claims.'" *McLaughlin*, 95 F.4th at 1248 (brackets omitted) (quoting *Shinn*, 596 U.S. at 385–87). And § 2254(e)(2)'s "restrictions also apply 'when a prisoner seeks relief based on new evidence *without* an evidentiary hearing.'" *Id.* (quoting *Shinn*, 596 U.S. at 389).

Thus, although Lee could try to argue cause and prejudice under *Martinez* to excuse the procedural default of Claim 2, there remains the problem that Lee cannot present evidence of either counsel's alleged ineffectiveness that was not presented in state court unless he can satisfy § 2254(e)(2). Presumably because § 2254(e)(2) presents an independent obstacle to success on his claim, Lee is clear in his briefing that he is not relying on the *Martinez* procedural default exception. He in fact specifically represents that "it could not be clearer that Lee does not rely on *Martinez*." Lee also does not argue that he meets the § 2254(e)(2) exceptions.

Instead, Lee offers two novel theories for obtaining a federal evidentiary hearing notwithstanding § 2254(e)(2). It appears that Lee raises the same two arguments in support of his claim that he has established "cause" to excuse his procedural default. As we now explain, these two theories are unpersuasive.

## B

*First*, Lee argues that he is entitled to a federal evidentiary hearing because Lorona, his state postconviction counsel, abandoned him. Lee theorizes that counsel's abandonment severed the principal-agent relationship, meaning that Lee did not "fail[] to develop the factual basis of [his] claim in State court proceedings," within the meaning of § 2254(e)(2). We understand Lee to also be invoking Lorona's alleged abandonment of Lee as "cause" to excuse Lee's failure to raise the Fetal Alcohol Syndrome and Fetal Alcohol Effects argument in state postconviction proceedings.

Lee's abandonment theory lacks merit. Even assuming, notwithstanding *Shinn v. Ramirez*, that attorney abandonment could provide grounds for avoiding the strictures of § 2254(e)(2), Lee's argument fails because Lorona did not abandon Lee. Abandonment occurs when counsel fails to "operat[e] as [petitioner's] agent in any meaningful sense of that word." *Maples v. Thomas*, 565 U.S. 266, 287 (2012) (first alteration in original) (quoting *Holland v. Florida*, 560 U.S. 631, 659 (2010) (Alito, J., concurring in part and concurring in judgment)). Abandonment can be evidenced by "counsel's near-total failure to communicate with petitioner or to respond to petitioner's many inquiries and requests over a period of several years," *id.* at 282 (citation omitted), or by counsel's

decision to "withdraw from the case" without notifying the petitioner or securing suitable replacement counsel, *id.* at 283. By contrast, an attorney's "negligent conduct" does not constitute abandonment. *Id.* at 281; *see also Gibbs v. Legrand*, 767 F.3d 879, 885–87 (9th Cir. 2014).

Lorona did not abandon Lee in the state postconviction proceedings. When Lee wrote letters to Lorona, Lorona responded and reported his work on the case. This is a far cry from a "near-total failure to communicate with petitioner," or similarly egregious conduct, that constitutes abandonment. *Maples*, 565 U.S. at 282 (quotation omitted). Further, Lorona's billing records—which included more than 150 entries between June 1999 and July 2000—show that Lorona conducted regular work on Lee's case, including collaborating with an investigator and consulting with Lee's trial counsel. The many motions Lorona filed also reflect his efforts in representing Lee. Ultimately, Lorona filed a substantial petition for state postconviction relief that raised nine claims, including several ineffective assistance claims. These actions are not the equivalent of abandonment.

Lee nevertheless argues that abandonment can be detected in Lee's contemporaneous letters to Lorona, in which Lee expresses frustration with Lorona's progress and asks for status updates. But any dissatisfaction that Lee felt toward Lorona does not negate the work that Lorona was doing on the case. Lee also complains that Lorona failed to meet with Simpson and confer with Lee. But the record shows that Lorona consulted with Simpson by phone and communicated with Lee by letter. A failure to conduct in-person meetings is not tantamount to a "near-total failure to communicate with petitioner" and does not constitute abandonment. *Id.* at 282.

Lee further contends that Lorona failed to "perform reasonably necessary legal work" and failed to plead "a colorable claim." Even if true, these allegations suggest at most that Lorona was "negligent," not that he failed to "operat[e] as [Lee's] agent in any meaningful sense of that word." *Id.* at 287 (internal citation and quotation marks omitted). Lorona's failure to file an amended petition or reply brief after obtaining an extension again reflects negligence at most. *See Gibbs*, 767 F.3d at 887 (noting that in a prior case, an "attorney's alleged negligence did not rise to the level of abandonment or egregious misconduct because he actually represented his client and filed a habeas petition, albeit an imperfect one." (citing *Towery v. Ryan*, 673 F.3d 933, 936 (9th Cir. 2012) (per curiam))). Lee's abandonment theory thus fails to save him from the requirements of § 2254(e)(2). It also does not establish "cause" to excuse his procedural default.

*Second*, Lee argues that the requirements of § 2254(e)(2) do not apply because the Arizona Supreme Court did not follow a "meaningful process" when it appointed Lorona as Lee's postconviction counsel. Essentially, Lee argues that the Arizona Supreme Court's constitutionally inadequate appointment process provides both cause for Lee's procedural default and grounds for avoiding the requirements of § 2254(e)(2). This argument also fails. Once again, even assuming this theory could provide grounds for avoiding § 2254(e)(2), *but see Shinn*, 596 U.S. at 385–86, it is meritless because there is no basis to conclude that the Arizona Supreme Court followed an inadequate process in appointing postconviction counsel.

In claiming a deficient appointment process, Lee points to the fact that the Arizona Supreme Court's committee for appointing postconviction counsel initially recommended

against the appointment of Lorona, and that a memorandum from that committee noted, "Too many cases per attorney – Lorona 5." According to Lee, this indicates that the Arizona Supreme Court did not act in "good faith" when it appointed Lorona.

This argument fails. The record shows that the Arizona Supreme Court's committee engaged in a thoughtful vetting process for selecting counsel for capital defendants in their state postconviction proceedings. Over two hundred letters were sent to attorneys requesting that they apply for appointment, after which applicants were screened and interviewed. Though Lorona was not initially selected for an interview, the committee report noted that judges had "very positive" experiences with him. In noting that there were "too many cases per attorney" in the case of Lorona, the committee's memorandum just as probably reflects an acknowledgment that Lorona's caseload was substantial. It does not show, as Lee contends, that the court selected an "utterly unqualified" attorney to represent Lee.

Section 2254(e)(2) thus applies. Because Lee does not argue that he can otherwise satisfy the requirements of that provision, he was not entitled to a federal evidentiary hearing or to introduce new evidence in federal court, and his claim must rest on the state court record. *See McLaughlin*, 95 F.4th at 1248. And for the reasons we have set forth, Lee's two theories also do not provide "cause" to excuse his failure to raise his ineffective assistance claim in state postconviction proceedings.

## C

Even if Lee could demonstrate cause to excuse the procedural default—whether based on his postconviction counsel's failure to raise his current Sixth Amendment

theory in state court, or on any other theory—Lee still cannot demonstrate prejudice. Lee's prejudice argument depends on the new evidence that Lee did not put forward in state court, and, as we discussed above, § 2254(e)(2) prevents federal courts from relying upon that new evidence. *See McLaughlin*, 95 F.4th at 1248. Lee does not argue that, absent his new evidence, he can demonstrate ineffective assistance of trial counsel for failure to investigate and present fetal-alcohol evidence at sentencing. His ineffective assistance claim necessarily fails, and he cannot show prejudice to excuse his procedural default.

But even considering Lee's new theory and evidence, Lee still cannot show prejudice. *See Martinez*, 566 U.S. at 10. To show prejudice even under *Martinez*, a petitioner must "demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Id.* at 14; *see also Dickinson v. Shinn*, 2 F.4th 851, 858 (9th Cir. 2021). Lee cannot demonstrate prejudice from the procedural default because his underlying *Strickland* claim lacks merit. That is, because Lee can show neither that his trial counsel performed deficiently nor that this alleged deficient performance prejudiced him, *see Richter*, 562 U.S. at 104, Lee cannot demonstrate prejudice from his postconviction counsel's failure to raise the fetal alcohol ineffective assistance theory in state postconviction proceedings.

1

First, Lee cannot show deficient performance by his trial counsel. Under *Strickland*'s performance prong, "[a] convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are

alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. We "then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* In performing this analysis, the question is whether "counsel's representation fell below an objective standard of reasonableness." *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 688). "Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial." *Id* at 110 (quoting *Strickland*, 466 U.S. at 686).

In the capital sentencing context, "'counsel has a duty to make reasonable investigations *or* to make a reasonable decision that makes particular investigations unnecessary'" during the penalty phase of a trial." *Bolin v. Davis*, 13 F.4th 797, 804 (9th Cir. 2021) (emphasis in original) (quoting *Carter v. Davis*, 946 F.3d 489, 513 (9th Cir. 2019) (per curiam)). But when assessing counsel's performance, we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *see also Cullen v. Pinholster*, 563 U.S. 170, 196 (2011).

In this case, Simpson's performance in the penalty phases was within the "wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. At sentencing, Simpson put forward wide-ranging mitigating evidence on Lee's behalf, including about Lee's age, deprived childhood, mental capacity and personality traits, remorse, lack of prior criminal record, and strong support from Lee's family and friends. Among other things, Simpson put on evidence showing how Lee was "ping-

pong[ed]" between homes as a young child and received no familial affection, with his parents often leaving Lee with another family and then not contacting him. Simpson also emphasized Lee's diminished mental capacity and psychological orientation, which placed him in the 99th percentile of "the compliance scale" and showed that he was a "follower, not a leader." Simpson put on evidence that these mitigating factors were the only explanation for Lee's otherwise inexplicable crimes, especially when Lee had no criminal record apart from stealing a bicycle at the age of fifteen.

Although Simpson did not introduce evidence of fetal brain damage from alcohol exposure, Simpson did put forward evidence of how Lee's mother abused alcohol, including before Lee was born. Simpson's investigator testified that Lee's "mother abused alcohol for a number of years, including, prior to his birth." Specifically, "[d]uring the period of before he was born," Lee's mother would be furnished with "a case of beer every other day, and then that was augmented" to a "case of beer every other day with two 12-packs in between."

Simpson's efforts in representing Lee did not go unnoticed. The same state trial judge who presided over Lee's trials commented when denying Lee's state postconviction petition that Lee "received an excellent defense from a very competent and experienced attorney." The trial judge reached this conclusion based on his own "observations in the pretrial stage, at trial, and finally at sentencing." These comments from a judge who observed Lee's counsel's performance firsthand support the conclusion that counsel did not act deficiently. *See Schriro v. Landrigan*, 550 U.S. 465, 476 (2007) ("[T]he judge presiding on postconviction review was ideally situated to

make this assessment because she is the same judge who sentenced Landrigan . . ."); *Mann v. Ryan*, 828 F.3d 1143, 1157–58 (9th Cir. 2016) (en banc) (similar). In short, based on the record before the state court, there would be no basis to conclude that Simpson's presentation of mitigating evidence fell below Sixth Amendment standards.

Notwithstanding this, Lee argues that Simpson was constitutionally ineffective for failing to present evidence of neurological damage caused by *in utero* exposure to alcohol. But even if we considered Lee's proffered evidence, Lee cannot overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Lee principally argues that Simpson performed deficiently by relying upon psychologist Dr. Mickey McMahon as his expert. Lee contends that Simpson should have also retained an expert specially qualified in evaluating persons who had been exposed to alcohol *in utero*. In a declaration submitted to the district court, Simpson claimed that "[e]arly in the investigation of [Lee's] case, I began to suspect that he might have been exposed to alcohol *in utero* and that he had sustained neurological damage as a result of that exposure." But when Simpson raised this possibility with Dr. McMahon, Dr. McMahon responded that the theory lacked merit because Lee "did not display the 'facial characteristics' of a child with fetal alcohol syndrome." Dr. McMahon "therefore dismissed the possibility that [Lee] suffered any neurological impairment as a result of *in utero* alcohol exposure." Simpson claims that he "[t]rust[ed] Dr. McMahon's assessment of the fetal alcohol exposure issue" and did not retain an additional expert to look into the issue further.

Simpson's reliance on Dr. McMahon did not amount to constitutionally ineffective assistance of counsel. "Counsel's failure to consult" with additional experts is "not unreasonable" when "counsel did retain medical experts whom he thought well-qualified." *Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998). In *Babbitt*, for example, we rejected the argument that defense counsel should have retained experts with particular expertise in post-traumatic stress disorder. *Id.* Instead, it was sufficient that counsel had retained qualified experts who "did not state that they required the services of . . . additional experts." *Id.* As we have explained, "[i]t is certainly within the 'wide range of professionally competent assistance' for an attorney to rely on properly selected experts." *Harris v. Vasquez*, 949 F.2d 1497, 1525 (9th Cir. 1990) (quoting *Strickland*, 466 U.S. at 690); *see also Stokley v. Ryan*, 659 F.3d 802, 813 (9th Cir. 2011) ("[N]either of the experts counsel hired unequivocally stated that Stokley should be examined by a neuropsychologist—and counsel was under no obligation to seek neuropsychological testing in the absence of any such recommendation.").

In this case, Simpson reasonably selected Dr. McMahon as an expert. As noted in a contemporaneous letter Simpson wrote to Lee's probation officer, Simpson believed that "Dr. McMahon has had a strong background in corrections, both adult and juvenile." Dr. McMahon's resume lists qualifications that would have enabled him to evaluate Lee for psychological impairments. Dr. McMahon held a doctorate in clinical psychology and had been a certified psychologist for nearly two decades by the time of Lee's 1993 trial. Since 1975, he had been a consultant to various government entities, including the Maricopa County Criminal Court Division, the Juvenile Court, and the Arizona

Department of Corrections in matters including the "[p]sychological evaluations and treatment of . . . [c]hildren and parents in cases of: child abuse, incorrigibility, delinquency, neglect, etc." Dr. McMahon also had experience examining patients "[f]or loss of specific neuropsychological abilities associated with organic brain damage," "[o]rganic [m]ental [d]isorder," and "alcohol/substance abuse disorders." In addition, Dr. McMahon had served as an expert in past criminal cases, including evaluating mitigating circumstances, with "[p]articular attention paid to the role of alcohol and substance abuse in the committing offense."

Given Dr. McMahon's qualifications and experience, Simpson was not ineffective in relying on Dr. McMahon. Although Simpson in a later declaration faulted himself for relying on Dr. McMahon, that declaration, expressed through "the distorting lens of hindsight," does not reflect "what was known and reasonable at the time the attorney made his choices." *Hendricks v. Calderon*, 70 F.3d 1032, 1036 (9th Cir. 1995) (citation omitted). The declaration does not show that Simpson "questioned or should have questioned the competence" of Dr. McMahon at the time of his investigation into Lee's mitigating circumstances. *Harris*, 949 F.2d at 1525.

Because it was reasonable for Simpson to retain Dr. McMahon, it was also reasonable for Simpson to not seek further expert assistance based on Dr. McMahon's disavowal of the theory that Lee might have developed neurological impairments from fetal alcohol exposure. When a retained expert "did not state that [he] required the services of . . . additional experts," there is "no need for counsel to seek them out independently." *Babbitt*, 151 F.3d at 1174; *see also Payton v. Cullen*, 658 F.3d 890, 896 (9th

Cir. 2011) ("Having retained qualified experts, it was not objectively unreasonable for [the attorney] not to seek others."). Counsel has a duty to provide the retained expert with "pertinent information about the defendant," *Caro v. Woodford*, 280 F.3d 1247, 1255 (9th Cir. 2002), and to investigate issues for which the expert has specifically "recommended further inquiry," *Bemore v. Chappell*, 788 F.3d 1151, 1172 (9th Cir. 2015). But here, Simpson provided Dr. McMahon with his suspicions about Lee's fetal alcohol exposure, and McMahon did not recommend further inquiry or retaining another expert. Simpson thus had no further constitutional duty to retain a different expert.

This conclusion is not undermined by Lee's argument that Fetal Alcohol Syndrome and Fetal Alcohol Effects were well-known in 1994 and that Dr. McMahon should have diagnosed it then. As one of Lee's new experts acknowledges, the Diagnostic and Statistical Manual of Mental Disorders (DSM) available at the time of the 1994 trial and sentencing did not contain a specific diagnostic code for a neurodevelopmental disorder associated with prenatal alcohol exposure, which exists only in "current diagnostic terminology." Another of Lee's new experts further recognizes that "[t]he majority of individuals [with Fetal Alcohol Syndrome and Fetal Alcohol Effect], particularly those born before 1973, went undiagnosed, and to this day the greatest majority of individuals continue to go undiagnosed."

It is thus doubtful that Dr. McMahon was incompetent for failing to diagnose Lee in 1994. But even if he were, it would not change our bottom-line conclusion about Lee's Sixth Amendment theory. "An expert's failure to diagnose a mental condition does not constitute ineffective assistance of counsel, and [a petitioner] has no constitutional guarantee

of effective assistance of experts." *Earp v. Cullen*, 623 F.3d 1065, 1077 (9th Cir. 2010). Thus, "[e]ven if the mental health professional[] who evaluated [Lee] at the time of his trial incorrectly concluded that [Lee] did not have organic brain damage, [Lee's] claim fails." *Id.* Dr. McMahon's alleged misdiagnosis does not demonstrate ineffective assistance of counsel.

Finally, Lee claims that Simpson was deficient because he failed to abide by the standards set forth in the 2003 revised edition of the American Bar Association (ABA) *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, *reprinted at* 31 HOFSTRA L. REV. 913 (2003). Lee relies on the commentary to Guideline 10.11, which explains that expert testimony concerning "the permanent neurological damage caused by fetal alcohol syndrome" could "lessen the defendant's moral culpability for the offense or otherwise support[] a sentence less than death." *Id.* at 1060–61.

Once again, Lee fails to demonstrate Simpson's deficient performance. A violation of the ABA Guidelines does not necessarily equate to a constitutional violation. *See Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (per curiam) (explaining that the ABA standards "can be useful as 'guides' to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place"); *Sansing v. Ryan*, 41 F.4th 1039, 1057 (9th Cir. 2022); *McGill v. Shinn*, 16 F.4th 666, 690 (9th Cir. 2021). Here, the 2003 ABA Guidelines on which Lee relies had not been promulgated at the time of Lee's sentencing, and the then-prevailing 1989 ABA Guidelines did not yet contain the guidance in question. *See* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989). Regardless, Simpson did put on mitigating

evidence of Lee's mental and psychological deficiencies, and he raised the fetal alcohol issue with Dr. McMahon. We cannot conclude that Simpson failed to abide by prevailing professional standards given his efforts to develop and present mitigating evidence.

2

Even assuming Simpson performed deficiently, Lee still could not show prejudice from the procedural default because any ineffective assistance of counsel did not prejudice Lee. "In the capital sentencing context, the prejudice inquiry asks 'whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Shinn v. Kayer*, 592 U.S. 111, 117–18 (2020) (per curiam) (quoting *Strickland*, 466 U.S. at 695). The standard is "highly demanding," *id.* at 118 (quoting *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986)), and "requires an evaluation of the strength of all the evidence and a comparison of the weight of aggravating and mitigating factors." *Thornell v. Jones*, 2024 WL 2751215, at *10 (U.S. May 30, 2024). The "reasonable probability" standard further requires a "'substantial,' not just 'conceivable,' likelihood of a different result." *Shinn*, 592 U.S. at 118 (quoting *Pinholster*, 563 U.S. at 189). In this case, even if Simpson had presented the fetal alcohol brain damage theory that Lee now proffers, there would not be a "substantial" likelihood that Lee would have evaded a death sentence. *Id.*

To start, it is speculative whether Lee's new evidence would have materially added to the overall case in mitigation. Lee argues that new evidence of alleged organic

brain damage would have cast him in a more sympathetic light. But as we have discussed above, trial counsel had already endeavored to show why, based on mitigating factors, Lee was undeserving of the death penalty. These mitigating factors included Lee's difficult and deprived childhood, age, lack of prior criminal history, difficulties in school, learning disability, mental limitations, and passive and suggestible personality. The sentencing hearing also included evidence that Lee's mother had abused alcohol before Lee was born.

The trial court acknowledged Lee's mitigating evidence, noting, for example, that Lee had a "dysfunctional" and "deprived childhood" in which he "was almost treated as chattel for his father," with parents who "seemingly never showed any affection toward the defendant" and "provided virtually no care." But referencing other mitigating circumstances that it did not find Lee had proven, the state trial court still noted that "even if this court were to consider every one of the factors proposed by the defendant as a mitigating circumstance," they would not be "sufficiently substantial to call for leniency" given the aggravating features of Lee's crimes. Under these circumstances, we are hard-pressed to conclude there is a substantial likelihood that evidence of fetal-alcohol issues would have resulted in a different sentence. *See Floyd v. Filson*, 949 F.3d 1128, 1139–40 (9th Cir. 2020) (holding that testimony on fetal alcohol syndrome would not have changed the balance of mitigating and aggravating factors); *cf. Bemore*, 788 F.3d at 1159–60, 1174–76 (recognizing that evidence of "organic brain damage" created a reasonable probability of a different sentence when trial counsel presented no mental health mitigation evidence to the sentencing jury and instead

presented other theories that damaged the defendant's credibility).

Lee argues that evidence of Fetal Alcohol Syndrome and Fetal Alcohol Effect would have specifically helped to explain his poor judgment and suggestibility. But at sentencing, Simpson had already put on evidence to build on those themes. Among other things, and in addition to Lee's age, Simpson introduced evidence through Dr. McMahon that Lee was in the 99th percentile of the "compliance scale" and the 96th percentile of the "suggestibility scale," that he was "a virtual door mat" in his extreme tendency to be a follower, and that he had "a diminished capacity to appreciate the consequences of his actions." Lee's new experts argue that his fetal alcohol brain damage provided an explanation for his developmental immaturity, but trial counsel had already worked to develop that impression of Lee. In light of this evidence, there is no reasonable probability that a different sentence would have resulted if Simpson had put on evidence of organic brain damage. *Shinn*, 592 U.S. at 117–18; *see also Floyd*, 949 F.3d at 1138–40.

In any event, even if this new evidence might have changed the complexion of the mitigation story to some extent, there is no reasonable probability that it would have overcome the extreme aggravating circumstance of Lee's offenses, especially considering the role he played in the murders. In evaluating prejudice, Lee "must show a reasonable probability" that a capital sentence would have been rejected after the sentencer "weighed the entire body of mitigating evidence . . . against the entire body of aggravating evidence." *Wong v. Belmontes*, 558 U.S. 15, 20 (2009) (per curiam); *see also Pinholster*, 563 U.S. at 198 (finding no prejudice when "[t]he State presented extensive

aggravating evidence"). And "where the aggravating factors greatly outweigh the mitigating evidence, there may be no 'reasonable probability' of a different result," even if the petitioner presents "substantial evidence of the kind that a reasonable sentencer might deem relevant to the defendant's moral culpability." *Jones*, 2024 WL 2751215, at \*7 (quotations omitted).

In this case, Lee's crimes involved numerous aggravating factors. Notwithstanding Lee's age and claimed follower personality, Lee played a lead role in three senseless murders of complete strangers in a matter of three weeks. *See Belmontes*, 558 U.S. at 25 (explaining that "the cold, calculated nature of the . . . murder" served as a "counterpoint" to new evidence of defendant's "impairment of the neurophysiological mechanisms for planning and reasoning"); *id.* at 28 (noting that evidence that defendant had committed another murder was "the most powerful imaginable aggravating evidence"); *see also Jones*, 2024 WL 2751215, at \*9 (noting that the Arizona Supreme Court has apparently never "vacated the judgment of death in a case involving multiple murders—let alone a case involving all of the aggravating circumstances present here").

And the murders involved other aggravating circumstances beyond their number. All three of the murders Lee committed involved pecuniary gain. The Reynolds and Drury murders involved phone calls that effectively lured the victims into the harrowing situations that would lead to their deaths. In the cases of Lacey and Drury, Lee fired numerous shots at each victim, plainly shooting to kill. And the murder of Linda Reynolds stands out for its unique depravity. Lee and Hunt kidnapped and sexually assaulted Reynolds, forced her to withdraw the last twenty dollars from her bank account, and then debated in

Reynold's presence whether to kill her. Then Lee shot Reynolds and stabbed her to finish the job, with the two men leaving Reynolds to die in the desert. As the trial court observed in the case of Reynolds, "[t]he amount of time which elapsed throughout the [w]hole ordeal, and the injuries and indignities suffered, amount to the height of cruelty."

Balancing the mitigating evidence against the horrific nature of Lee's crimes, in which he played a central role, Lee cannot establish prejudice from his trial counsel's failure to present evidence of alleged organic brain damage from fetal alcohol exposure. Lee thus cannot demonstrate prejudice from the procedural default of not raising this issue in state postconviction proceedings.

## III

We next turn to Lee's proposed claim (Proposed Claim 26) that the Arizona Supreme Court erred on direct appeal by refusing to consider mitigating evidence that lacked a causal nexus to his crimes. Lee challenges the following portion of the Arizona Supreme Court's opinion in *Lee I*:

> This court finds that the trial court properly rejected defendant's claim that he was merely a follower when he was armed with his own weapons in both murders, initiated both robberies by making the phone calls, pulled the trigger in both murders, and stabbed Reynolds. *Further, defendant has failed to establish a nexus between his deprived childhood and his crimes.* Upon independent review of all mitigation evidence offered by defendant, this court finds no mitigating

circumstances beyond those found by the
trial court.

944 P.2d at 1221 (emphasis added). Lee interprets this passage as applying a causal nexus test, in which the court did not consider his deprived childhood and other mitigating circumstances because it required that he demonstrate a nexus between that evidence and the murders, in violation of *Tennard v. Dretke*, 542 U.S. 274 (2004).

The district court denied Lee leave to add this claim to his § 2254 petition, finding that amendment would be futile because the claim was untimely, procedurally defaulted, and lacking merit. We agree on each point.

## A

The district court correctly denied leave to add Proposed Claim 26 because it was not timely presented for review. AEDPA imposes a one-year statute of limitations on habeas claims by state prisoners. *See* 28 U.S.C. § 2244(d)(1). Although Lee's original § 2254 petition was timely, he did not seek leave to add his causal nexus claim until years later. Lee argues, however, that under Federal Rule of Civil Procedure 15(c)(1)(B), Proposed Claim 26 was timely because it relates back to Claim 19 of his earlier petition, and is a "mere amplification" of that claim.

An amended pleading "relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). Specifically, a claim relates back if the original and amended claims are "tied to a common core of operative facts." *Mayle v. Felix*, 545 U.S. 644, 664 (2005). Conversely, a claim does not

relate back if it is "supported by facts that differ in both time and type from those the original pleading set forth."  *Id.* at 650.

The district court correctly rejected Lee's argument that Proposed Claim 26 shared a common core of operative facts with his Claim 19.  Claim 19 argued that "Arizona's statutory scheme for imposing the death penalty is unconstitutional because it does not sufficiently channel the sentencer's discretion."  The factual basis of Claim 19 rests on an asserted overbreadth of Arizona's capital sentencing scheme, *i.e.*, that it does not sufficiently narrow the class of individuals who could be subject to the death penalty. Proposed Claim 26, by contrast, rests on the Arizona Supreme Court's evaluation of mitigation evidence in Lee's particular case.

Lee argues that Proposed Claim 26 should nonetheless relate back because, based on several indirect links, it is ultimately connected to Claim 19.  Lee notes that Claim 19 cites *Woodson v. North Carolina*, 428 U.S. 280 (1976), and that *Woodson* in turn was cited in *Lockett v. Ohio*, 438 U.S. 586, 601 (1978).  Lee goes on to explain that we have cited *Lockett* and *Eddings v. Oklahoma*, 455 U.S. 104 (1982), in describing the Arizona Supreme Court's past unconstitutional applications of a causal nexus test.  To provide the final link, Lee maintains that *Tennard* relied on the *Lockett-Eddings* line of cases in rejecting a Fifth Circuit nexus test analogous to Arizona's.

Lee's attempt to connect Proposed Claim 26 to Claim 19 does not satisfy Rule 15.  The connection between cases that Lee advances is too generic to satisfy the "relating back" standard because the two claims at issue do not rest on a common core of operative facts.  *Mayle*, 545 U.S. at 664.

The district court thus did not err in denying Lee leave to add Proposed Claim 26 because it would be untimely under § 2244(d)(1).

## B

Even if it were timely, Proposed Claim 26 is also procedurally defaulted. A state procedural bar will foreclose federal court review of a claim in a § 2254 petition "if the decision of [the state] court rests on a state law ground that is *independent* of the federal question and *adequate* to support the judgment." *Lee v. Kemna*, 534 U.S. 362, 375 (2002) (emphasis and brackets in original) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). Here, Lee attempted to raise the causal nexus claim in his second postconviction petition in state court. The state trial court rejected this petition as improperly successive, holding that Arizona Rule of Criminal Procedure 32.2(a) precluded Lee from pursuing a claim that "should have been raised on direct appeal or in the first Rule 32 proceedings." The Arizona Supreme Court then denied review. The independent and adequate state law grounds for dismissal provide another reason why Lee's Proposed Claim 26 is futile. *See Kemna*, 534 U.S. at 375.

Lee does not challenge the independence of Arizona's procedural bar. Instead, he disputes whether the bar is "firmly established and regularly followed" by the Arizona courts, a requirement for a claim to be procedurally defaulted under a state procedural rule. *Id.* at 376 (quoting *James v. Kentucky*, 466 U.S. 341, 348 (1984)); *see also Murray v. Schriro*, 745 F.3d 984, 1016 (9th Cir. 2014). Lee's argument lacks merit.

Once the State carries the initial burden of showing an applicable state procedural bar, the burden shifts to the

petitioner to raise "specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule." *Williams v. Filson*, 908 F.3d 546, 577 (9th Cir. 2018) (citation omitted).   If the petitioner makes this showing, the burden then shifts back to the State to demonstrate that the rule has been consistently and regularly applied.   *Id.*   In this case, Lee has not cited "authority demonstrating inconsistent application" of the procedural bar.  *Id.*

Lee points to *Spreitz v. Ryan*, 916 F.3d 1262 (9th Cir. 2019), a case in which we ruled that the petitioner's causal nexus claim was not procedurally defaulted.  But *Spreitz* is inapposite because the petitioner there raised a causal nexus claim in his first state postconviction proceeding.  *Id.* at 1273 ("The first opportunity [petitioner] had to raise that claim was before the PCR court, at which time he did so.").  *Spreitz* supports the proposition that a claim is not procedurally defaulted if the petitioner brought the claim at the earliest opportunity in his postconviction proceedings.   Here, Lee failed to raise his claim in the first Rule 32 proceedings, so he cannot rely on *Spreitz* to avoid procedural default.

Next, Lee points to *(Ernesto) Martinez v. Ryan*, 926 F.3d 1215, 1235 (9th Cir. 2019), and *Djerf v. Ryan*, 931 F.3d 870, 885 (9th Cir. 2019), two cases in which we considered causal nexus claims on the merits without addressing the issue of procedural default.  But the fact that no issue of procedural default was raised or addressed in these cases does not demonstrate that Arizona has not regularly applied the procedural rule at issue here.  Lee has identified no Arizona authority supporting that theory.  And to the extent Lee argues that the procedural default here is different because the error of which he complains occurred on direct appeal

before the Arizona Supreme Court, he cites no authority indicating that Arizona courts have not required such a claim to be brought in an initial state postconviction petition.

Alternatively, Lee argues that, if Proposed Claim 26 is procedurally defaulted, he can show cause and prejudice to excuse the default for all the reasons he gave for Claim 2. As explained above, however, those theories lack merit.

## C

Finally, even if Proposed Claim 26 was timely and not procedurally defaulted, the claim fails on the merits. Contrary to Lee, the Arizona Supreme Court did not refuse to consider mitigating evidence because it lacked a causal nexus to Lee's crimes. The court instead gave less weight to Lee's mitigating evidence than Lee would have wanted, which the court was permitted to do. And even assuming the Arizona Supreme Court did apply an unconstitutional causal nexus test, Lee's claim would still fail because any error was harmless.

## 1

The Arizona Supreme Court did not apply an unconstitutional causal nexus test. For a death sentence to meet the requirements of the Eighth and Fourteenth Amendments, the sentencer must not "refuse to consider, *as a matter of law*, any relevant mitigating evidence." *Eddings*, 455 U.S. at 114 (emphasis in original). But sentencers may "determine the weight to be given relevant mitigating evidence," so long as they do not "exclud[e] such evidence from their consideration." *Id.* at 114–15; *see also Jones*, 2024 WL 2751215, at *6 ("*Eddings* held that a sentencer may not 'refuse to consider . . . any relevant mitigating evidence.' It did not hold that a sentencer cannot find

mitigating evidence unpersuasive.") (quoting *Eddings*, 455 U.S. at 114); *Harris v. Alabama*, 513 U.S. 504, 512 (1995) ("[T]he Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or mitigation, to be considered by the sentencer."); *Ortiz v. Stewart*, 149 F.3d 923, 943 (9th Cir. 1998) ("While it is true that a sentencer may not 'refuse to consider, *as a matter of law*, any relevant mitigating evidence,' a sentencer is free to assess how much weight to assign to such evidence." (citations omitted)), *abrogated on other grounds by Martinez*, 566 U.S. at 9.  The question is thus whether the Arizona Supreme Court refused to consider Lee's mitigating evidence because there was no causal nexus, or instead found that it did not outweigh the aggravating circumstances here.

Lee construes the Arizona Supreme Court's opinion as excluding the consideration of mitigating evidence altogether when it stated that "defendant has failed to establish a nexus between his deprived childhood and his crimes." *Lee I*, 944 P.2d at 1221.  Lee also points out that the Arizona courts have, in the past, run afoul of the constitutional principle from *Eddings* at times.  As we explained in *McKinney v. Ryan*, 813 F.3d 798, 815 (9th Cir. 2015) (en banc), "the Arizona Supreme Court routinely articulated and insisted on its unconstitutional causal nexus test" for about "fifteen years" spanning roughly the mid-1980s to 2000.  The Arizona Supreme Court decided *Lee I* in this timeframe.  Lee argues that, "consistent with" this history, here "the Arizona Supreme Court . . . necessarily screened that evidence and discounted it as having no value as mitigation because it bore no causal connection to the murder."

As we have explained, however, *McKinney* "resolved only the 'precise question' whether the state court had applied the causal-nexus test in that specific case." *Greenway v. Ryan*, 866 F.3d 1094, 1095–96 (9th Cir. 2017) (per curiam) (quoting *McKinney*, 813 F.3d at 804). *McKinney* did not hold "that Arizona had always applied" this unconstitutional test. *Id.* at 1095. We "therefore must examine the state court decisions in [Lee's] case to determine whether they took into account all mitigating factors." *Id.* at 1096. This inquiry includes looking to the trial judge's ruling to the extent it was "adopted or substantially incorporated" by the higher court. *McKinney*, 813 F.3d at 819.

Here, the state courts' rulings indicated their consideration of all mitigating factors. For example, in *Lee I*, the Arizona Supreme Court explained:

> For each of the murders, we find that (1) defendant has proved by a preponderance of the evidence the mitigating circumstances of defendant's age, lack of significant prior criminal history, deprived childhood, cooperation with law enforcement officials and assistance in recovery of weapons, and remorse; and (2) the mitigating circumstances are not sufficiently substantial, taken either separately or cumulatively, to call for leniency.

944 P.2d at 1221. Though the court noted that "defendant has failed to establish a nexus between his deprived childhood and his crimes," the Arizona Supreme Court did

not state that it was not considering such evidence altogether. *Id.*

The Arizona high court's reference to "nexus" was not an invocation of the unconstitutional test. The court instead stated that a trial court "must consider all evidence offered in mitigation." *Id.* at 1220. It further explained that trial courts "should consider each mitigating circumstance individually and all mitigating circumstances cumulatively when weighing the mitigating and aggravating factors." *Id.* at 1221 (citation and emphases omitted). The Arizona Supreme Court also stated that it "f[ound] no mitigating circumstances beyond those found by the trial court," and the reference to the mitigating circumstances found by the trial court included the evidence of Lee's deprived childhood. *Id.* The trial court had earlier explained that it considered "the defendant's deprived childhood" to be a mitigating circumstance that was "proved by a preponderance of the evidence." Thus, both the state trial court and high court considered Lee's deprived childhood as a mitigating factor. The Arizona high court simply rejected Lee's request to "give *greater weight* to his deprived childhood." *Id.* (emphasis added).

Further, this case is distinguishable from *McKinney*. In *McKinney*, we found that the Arizona Supreme Court had applied an unconstitutional causal nexus test based on a confluence of three facts:

> (1) the factual conclusion by the sentencing judge, which the Arizona Supreme Court accepted, that McKinney's PTSD did not "in any way affect[ ] his conduct in this case," (2) the Arizona Supreme Court's additional factual conclusion that, if anything,

> McKinney's PTSD would have influenced him *not* to commit the crimes, and (3) the Arizona Supreme Court's recital of the causal nexus test for nonstatutory mitigation and its pin citation to the precise page in [*State v. Ross*, 886 P.2d 1354 (Ariz. 1994)], where it had previously articulated that test.

813 F.3d at 821 (first alteration in original). From these facts, we "conclude[d] that the Arizona Supreme Court held, as a matter of law, that McKinney's PTSD was not a nonstatutory mitigating factor, and that it therefore gave it no weight." *Id.*

None of those circumstances exists here. The sentencing judge never concluded that Lee's deprived childhood did not "in any way affect[ ] his conduct in this case." *Id.* (alteration in original). Nor did the Arizona Supreme Court state that Lee's deprived childhood would have made his crime less likely. And the Arizona Supreme Court did not recite the causal nexus test from *Ross* or give a pin citation to its previous articulation of the test in *Ross*.

Lee argues that the Arizona Supreme Court in this case cited approvingly *State v. Stokley*, 898 P.2d 454 (Ariz. 1995), a case that applied a causal nexus test. True, *Stokley* applied a causal nexus test, and the Arizona Supreme Court cited *Stokley* in both its opinions in Lee's appeals. *See Lee I*, 944 P.2d at 1218, 1221; *Lee II*, 944 P.2d at 1230, 1232. But in both opinions, the Arizona Supreme Court cited *Stokley* only for the uncontested propositions that it needed to "independently weigh[] the aggravating and mitigating circumstances related to each death sentence imposed on the defendant," *Lee I*, 944 P.2d at 1221, *Lee II*, 944 P.2d at

1231–32, and that "trial judges are presumed to know the law," *id.* at 1230 (citation and quotation marks omitted).

2

Finally, even if the Arizona Supreme Court applied an unconstitutional causal nexus test, Lee cannot show prejudice. In evaluating whether a causal nexus error was prejudicial, we consider whether it had a "substantial and injurious effect or influence in determining the [sentencer's] verdict." *McKinney*, 813 F.3d at 822 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)). To do so, we "review aggravating factors proven by the State and other mitigating evidence presented to the sentencing court," and then "ask whether consideration of the improperly ignored evidence 'would have had a substantial impact on a capital sentencer who was permitted to evaluate and give appropriate weight to it.'" *Djerf*, 931 F.3d at 885 (quoting *McKinney,* 813 F.3d at 823).

When there is "overwhelming evidence supporting the aggravating factors," a causal nexus error will not create prejudice if "whatever weight" would have been afforded to the proffered mitigation evidence "would not be sufficient to call for leniency." *Apelt v. Ryan*, 878 F.3d 800, 840 (9th Cir. 2017); *see also Greenway*, 866 F.3d at 1100 ("[E]ven if we were to determine that the state court did apply the causal-nexus test in violation of *Eddings*, there could have been no prejudice because the aggravating factors overwhelmingly outweighed all the evidence that Greenway asserted as mitigating."); *Djerf*, 931 F.3d at 885–86 (finding a causal nexus error harmless where "the undisputed facts substantiating the 'heinous, cruel, or depraved' finding [were] especially powerful").

As we have discussed above, Lee's crimes involved significant aggravating factors. His difficult childhood and other mitigating circumstances would not have created a "substantial impact" on the sentencer's judgment. *Id.* at 885; *see also Stokley v. Ryan*, 705 F.3d 401, 405 (9th Cir. 2012) ("In light of the Arizona courts' consistent conclusion that leniency was inappropriate, there is no reasonable likelihood that, but for a failure to fully consider Stokley's family history or his good behavior in jail during pre-trial incarceration, the Arizona courts would have come to a different conclusion."). As the trial court observed at sentencing in *Lee I*,

> [E]ven if this Court were to consider every one of the factors proposed by defendant as a mitigating circumstance, when balanced against the aggravating factors of the cruelty, heinousness and depravity of Linda Reynolds murder, and the depravity of David Lacey's murder, together with the factor that Lacey's murder came just nine days after Mrs. Reynolds['s] murder, those mitigating circumstances would not be sufficiently substantial to call for leniency.

The trial court in *Lee II* made similar comments when considering the murder of Harold Drury. Given the aggravating circumstances, any application of a causal nexus test by the Arizona Supreme Court would have been harmless.

In sum, based on untimeliness, procedural default, and overall lack of merit, we affirm the district court's denial of

Lee's request for leave to amend his § 2254 petition to add Proposed Claim 26.

*       *       *

For the foregoing reasons, the denial of Lee's § 2254 petition and denial of Lee's motion to amend are

**AFFIRMED.**