**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DAVID MARTINEZ RAMIREZ,

*Petitioner-Appellant*,

v.

RYAN THORNELL, Director of
Arizona Department of Corrections,
Rehabilitation and Reentry,

*Respondent-Appellee*.

No. 10-99023

D.C. No. 2:97-cv-
01331-JAT

OPINION

Appeal from the United States District Court
for the District of Arizona
James A. Teilborg, District Judge, Presiding

On Remand from the United States Supreme Court

Argued and Submitted March 19, 2024
Submission Deferred June 3, 2024
Resubmitted April 1, 2026
San Francisco, California

Filed April 9, 2026

Before:  Sidney R. Thomas, Marsha S. Berzon, and Richard
R. Clifton, Circuit Judges.

Opinion by Judge Sidney R. Thomas;
Partial Dissent by Judge Berzon

# SUMMARY[*]

## Habeas Corpus / Death Penalty

On remand from the United States Supreme Court, the panel affirmed the district court's judgment denying David Ramirez's federal habeas corpus petition under 28 U.S.C. § 2254 challenging his Arizona conviction and death sentence for the murders of his girlfriend and her daughter.

In its prior decision, the panel affirmed the district court in part, reversed in part, and remanded the case for the district court to hold an evidentiary hearing on Ramirez's ineffective assistance of counsel ("IAC") claim. The Supreme Court reversed, holding that "under § 2254(e)(2), a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel."

The panel considered on remand what evidence from the state court record is available to support Ramirez's IAC claim and whether Ramirez demonstrated cause and prejudice to excuse the procedural default of his IAC claim under *Martinez v. Ryan*, 566 U.S. 1 (2012).

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Because the state court did not address Ramirez's IAC claim on the merits, the panel did not owe any special deference to the state court decision under the Anti-Terrorism and Effective Death Penalty Act.

The panel held that when evaluating whether the procedural default of a particular claim should be excused under *Martinez*, a federal habeas court may consider evidence that was submitted to the state court in accordance with state procedural rules, regardless of the timing of or purpose for submission.

The panel held that Ramirez demonstrated "cause" to excuse his procedural default under *Martinez*. It was undisputed that Arizona law required IAC claims to be raised in collateral proceedings, and that Ramirez's counsel in the initial state collateral review proceeding was ineffective.

But Ramirez did not demonstrate "prejudice." Examining the properly considered evidence in this case, the panel held that Ramirez cannot overcome the procedural default of his IAC claim because the underlying claim is not "substantial" within the meaning of *Martinez*. Under *Martinez,* a "substantial" IAC claim is one that has "some merit" under the standards of *Strickland v. Washington*, 466 U.S. 668 (1984). In order to satisfy the *Strickland* standard, the defendant is required to show "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." In Ramirez's case, counsel's performance at sentencing was deficient, but, under *Thornell v. Jones*, 602 U.S. 154 (2024), and *Lee v. Thornell*, 118 F.4th 969 (9th Cir. 2024), Ramirez cannot establish that the deficiency sufficiently prejudiced his defense.

The panel declined to reach four uncertified issues.

Dissenting in part, Judge Berzon would grant a certificate of appealability with regard to Ramirez's claim under *Atkins v. Virginia*, 536 U.S. 304 (2002), hold that the claim relates back to Ramirez's IAC claim, and remand to the district court for further proceedings.

---

## COUNSEL

Paula K. Harms (argued), Timothy M. Gabrielsen, and Nicole E. List, Assistant Federal Public Defenders; Jon M. Sands, Federal Public Defender; Office of the Federal Public Defender, Phoenix, Arizona; for Petitioner-Appellant.

W. Scott Simon (argued), Assistant Attorney General; John P. Todd, Special Assistant Attorney General; Jeffrey L. Sparks and Jason D. Lewis, Deputy Solicitors General, Section Chiefs, Capital Litigation Section; Lacey S. Gard, Chief Counsel; Kristin K. Mayes and Mark Brnovich, Arizona Attorneys General; Office of the Arizona Attorney General, Phoenix, Arizona; for Respondent-Appellee.

# OPINION

S.R. THOMAS, Circuit Judge:

This appeal returns to us on remand from the United States Supreme Court. *Shinn v. Ramirez*, 596 U.S. 366 (2022). In our prior decision, we affirmed the district court in part, reversed in part, and remanded the case for the district court to hold an evidentiary hearing on Ramirez's ineffective assistance of counsel ("IAC") claim. *Ramirez v. Ryan*, 937 F.3d 1230, 1234–40 (9th Cir. 2019) ("*Ramirez I*"). The Supreme Court reversed, holding that "under § 2254(e)(2), a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel." *Shinn*, 596 U.S. at 382. Therefore, on remand, we consider what evidence from the state court record is available to support Ramirez's IAC claim and whether Ramirez has demonstrated cause and prejudice to excuse the procedural default of his IAC claim under *Martinez v. Ryan*, 566 U.S. 1 (2012).[1]

We have jurisdiction under 28 U.S.C. § 2253. Ramirez's habeas petition is governed by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2254 ("AEDPA"). We review de novo the district court's denial of habeas relief and determination that counsel was not constitutionally

---

[1] Ramirez also seeks to appeal four uncertified issues: whether the "abandonment" exception entitles Ramirez to a hearing on his IAC claim, whether the "miscarriage of justice" exception excuses Ramirez's procedural default, whether the "inadequate procedural bar" exception excuses Ramirez's procedural default, and whether the determination in Ramirez's *Atkins* proceeding was constitutionally flawed. As in our prior opinion, we decline to reach the uncertified issues.

ineffective. *Leeds v. Russell*, 75 F.4th 1009, 1016 (9th Cir. 2023). We generally review the district court's factual findings for clear error, *id.*, but here, the district court did not conduct an evidentiary hearing or make factual findings for us to review. Because the state court did not address Ramirez's IAC claim on the merits, we do not owe any special deference to the state court decision under AEDPA. *Id.*; *see also Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

We hold that when evaluating whether the procedural default of a particular claim should be excused under *Martinez*, a federal habeas court may consider evidence that was submitted to the state court in accordance with state procedural rules, regardless of the timing of or purpose for submission. However, examining the properly considered evidence in this case, we hold that Ramirez cannot overcome the procedural default of his IAC claim because the underlying claim is not "substantial" within the meaning of *Martinez*. Accordingly, we affirm the judgment of the district court denying a writ of habeas corpus.

I

The facts regarding Ramirez's underlying conviction are extensively discussed in the Arizona Supreme Court opinion affirming Ramirez's convictions on direct appeal, *State v. Ramirez*, 871 P.2d 237 (Ariz. 1994) (en banc), and we previously described the underlying factual and procedural history of this case, *Ramirez I*, 937 F.3d at 1234–40, so we need not describe the history in detail. In brief, Ramirez was convicted by a jury and sentenced to death by a judge for the 1989 murders of his girlfriend, Mary Ann Gortarez, and Gortarez's daughter, Candie. Both victims were stabbed multiple times with various household items—a kitchen

knife, cake knife, box cutter, and pair of scissors. Candie, a 15-year-old, was found naked. Ramirez admitted to having sex with Candie before murdering her. The victims' prolonged cries for help, blood discovered throughout the apartment, and expert testimony established that the victims endured great pain and suffering over a prolonged period of time.

The sentencing judge found three aggravating circumstances: Ramirez committed multiple murders at the same time; the murders were committed in an especially cruel, heinous, or depraved manner; and Ramirez had two prior violent felony convictions. *State v. Ramirez*, 871 P.2d at 242.

The judge found one statutory mitigating circumstance: Ramirez's "capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law was significantly impaired." *Id.* at 252. The judge also found the following non-statutory mitigating circumstances:

> (1) his unstable family background,
> (2) his poor educational experience,
> (3) that he was a victim of sexual abuse while he was young,
> (4) his gang affiliation,
> (5) his excellent work record while in prison,
> (6) his remorse,
> (7) his chronic substance abuse,
> (8) his psychological history, and,
> (9) his love of family.

*Id.*

The judge sentenced Ramirez to death on both counts. *Id.* at 239. The Arizona Supreme Court affirmed Ramirez's convictions and sentence on direct appeal, *id.*, and the United States Supreme Court denied certiorari, *Ramirez v. Arizona*, 513 U.S. 968 (1994).

Ramirez then filed three petitions for postconviction relief in state court. Ramirez's first petition, filed on November 6, 1995, did not raise his current IAC claim. The State does not dispute that the attorney who assisted Ramirez in bringing this first petition was constitutionally ineffective. With new counsel, Ramirez filed notice of a second petition raising his current IAC claim on April 28, 2005. The state court denied the second petition as untimely.

On July 1, 2005, Ramirez filed a third petition, which argued that Ramirez had an intellectual disability prohibiting his execution under *Atkins v. Virginia*, 536 U.S. 304 (2002). Along with the *Atkins* petition, counsel filed multiple supporting declarations. After an eight-day evidentiary hearing, the state court resolved Ramirez's *Atkins* claim on its merits, concluding that Ramirez had not proven by clear and convincing evidence that he satisfied Arizona's statutory definition of intellectual disability.

Ramirez filed his initial federal habeas petition in 1997. At first, the federal district court held that Ramirez's IAC claim was procedurally defaulted. In 2012, the Supreme Court decided *Martinez*, which held that, in certain circumstances, ineffective assistance of postconviction counsel can constitute cause to excuse the procedural default of a substantial IAC. 566 U.S. at 17. As Ramirez's appeal to this Court was pending at that time, we remanded to the district court with instructions to reconsider its prior decision in light of *Martinez*. In litigating in the district court whether

*Martinez* excused the procedural default, Ramirez submitted many of the same supporting declarations that were filed alongside the third state petition seeking *Atkins* relief, as well as additional declarations. The district court concluded that Ramirez's IAC claim failed on its merits, and was thus insufficient to excuse procedural default. It denied habeas relief on that basis. As we have noted, we reversed and remanded, holding that the district court had applied an incorrect legal standard and that the declarations submitted to the district court demonstrated cause and prejudice to overcome the procedural default. *See Ramirez I*, 937 F.3d at 1248, 1251. The Supreme Court reversed and remanded for further proceedings. *Shinn*, 596 U.S. at 391.

## II

We must first determine what evidence we can now consider on remand. To do so, we briefly review the relevant legal history. Ramirez argues his procedural default should be excused under *Martinez*, which held that when postconviction proceedings are the first opportunity to raise an IAC claim, ineffective assistance of postconviction counsel may establish cause to excuse the procedural default of that IAC claim. *Martinez*, 566 U.S. at 9. The Supreme Court has explained this rule as having three rationales. *Trevino v. Thaler*, 569 U.S. 413, 422–23 (2013) (citing *Martinez*, 566 U.S. at 10–13). First, the "right to the effective assistance of counsel at trial is a bedrock principle in our justice system." *Id.* at 422 (quoting *Martinez*, 566 U.S. at 12). Second, absent such a rule, defendants in states that only allow IAC claims to be raised in postconviction proceedings would be disadvantaged compared to their counterparts in other states, who are able to demonstrate cause to excuse procedural default based on ineffective assistance during direct review. *See id.* (citing *Martinez*, 566

U.S. at 10–13).  Third, the Court aimed to avoid a situation in which ineffective assistance of postconviction counsel "deprive[s] a defendant of any review of [the underlying IAC] claim at all."  *Id.* at 423 (citing *Martinez*, 566 U.S. at 10).

Subsequent decisions have limited the evidence a federal habeas court may consider when evaluating excuse for procedural default under *Martinez*.  In *Shinn*, the Supreme Court held that when evaluating the merits of an IAC claim whose default was excused under *Martinez*, a federal habeas court generally may not "order an evidentiary hearing or otherwise expand the state-court record" unless the petitioner can satisfy one of 28 U.S.C. § 2254(e)(2)'s narrow exceptions.  *Shinn*, 596 U.S. at 371, 384.**²**  Relying on *Shinn*, we held in *McLaughlin v. Oliver*, 95 F.4th 1239 (9th Cir. 2024) that federal habeas courts may also only consider evidence submitted in accordance with state procedural rules when evaluating excuse for procedural default under *Martinez*.  *Id.* at 1250.  In addition, *McLaughlin* held that evidence submitted in state court to support the procedurally defaulted petition was *not* submitted in accordance with state procedural rules, and thus could not be considered.  *Id.* at 1249 (explaining that because the "successive petition, with

---

² In *Rodney v. Garrett*, 116 F.4th 947 (9th Cir. 2024), we recognized an exception to this general rule: when a prisoner "did all that he could to develop the evidentiary bases of his IAC claims in state court" but was thwarted by the state court, the federal court may then consider evidence outside the state court record.  *Id.* at 957.  Such a case is not controlled by *Shinn*, because the prisoner has not "failed to develop the factual basis of [their] claim in State court proceedings."  *See id* at 956.  This exception does not apply here, because, unlike in *Rodney*, the state court did not prevent Ramirez from developing the record.  Also, Ramirez was represented by post-conviction counsel who had an opportunity to file evidence.

its new evidence, 'was procedurally barred,'" the evidence was not presented "in compliance with state procedural rules" (quoting *Shinn,* 596 U.S. at 375–76)). In sum, federal habeas courts evaluating excuse for procedural default under *Martinez* are generally limited to evidence submitted to the state court in accordance with state procedural rules.

In this case, evidence submitted in support of Ramirez's procedurally defaulted petition or submitted for the first time in district court is not part of the procedurally proper state court record. *See McLaughlin*, 95 F.4th at 1249. However, as the State concedes, the evidence developed in state court in support of Ramirez's *Atkins* claim is part of the procedurally proper state court record. This *Atkins* record, which contains information submitted to the state court or developed during a nine-day hearing before the state court, is clearly part of the state court record. The *Atkins* record is also procedurally proper, as it was filed in accordance with state procedural rules and the state court considered the evidence. *Cf. id.* (explaining that the state court "declined to consider" evidence that "was procedurally barred" (citation modified)).[3]

The State argues that we cannot consider the *Atkins* record because it was submitted in support of a different claim and was developed after Ramirez's IAC claim was denied as being procedurally defaulted. The State's proposed claim-specificity and timing requirements are unsupported. Neither *Shinn* nor *McLaughlin* discuss

---

[3] We are additionally limited to considering "only the district court record on appeal." *Lowry v. Barnhart*, 329 F.3d 1019, 1024 (9th Cir. 2003). The *Atkins* record was before the district court at the time it denied Ramirez's habeas petition.

evidentiary claim-specificity or timing, and the State has not pointed to any other authority imposing such limits.

The claim-specificity limitation that the State endorses is incongruent with general practices of appellate review. When reviewing a district court decision, we review the entire district court record preceding the decision on review, regardless of the motion or claim to which it was related. *See* Fed. R. App. P. 10(a); *see also Love v. Royall*, 179 F.2d 5, 7 (8th Cir. 1950) (denying motion to strike papers from a separate court proceeding that had been before the district court); *cf. Kirshner v. Uniden Corp. of Am.*, 842 F.2d 1074, 1078 (9th Cir. 1988) (distinguishing *Love* where the papers were not before the district court). Furthermore, in advocating for a state-court record limitation, the State's own *amici* argued that "evidence developed in state court for other purposes, such as to support a different claim . . ., can be considered in federal court to support a *Martinez*-excused ineffective-assistance claim consistent with section 2254(e)(2)." Brief for the States of Texas, et al. as Amicus Curiae in Support of Petitioners*, Shinn v. Ramirez*, 596 U.S. 366 (2022) (No. 20-1009), 2021 WL 797838, at *16.

Likewise, in the context of reviewing excuse for procedural default, a timing restriction would serve no jurisprudential purpose. When reviewing a state court's decision on the merits, federal habeas courts may not consider evidence introduced to the state court after the date of the decision under review. *Holland v. Jackson*, 542 U.S. 649, 652 (2004). The purpose of that rule is to respect state court jurisprudence. Absent such a rule, a state court could "be deemed to have unreasonably applied federal law to evidence it did not even know existed." *Cullen v. Pinholster*, 563 U.S. 170, 183 n.3 (2011).

Reviewing a procedurally defaulted claim is different. The federal habeas court is not reviewing the merits of a state court's decision, because "there is no state court decision" to review. *Pirtle*, 313 F.3d at 1167. "Under these circumstances, concerns about comity and federalism that arise when a state court reaches the merits of a petition for post-conviction relief do not exist." *Id.* Therefore, consideration of the later-submitted state court evidence is proper and in accord with the principles of comity and federalism. Indeed, the Supreme Court has "emphasized before the importance of reviewing capital sentences on a complete record." *Dobbs v. Zant*, 506 U.S. 357, 358 (1993). Accordingly, we conclude that we may consider the *Atkins* record—part of the procedurally proper state court record— in evaluating whether the procedural default should be excused under *Martinez*.

## III

Having determined what evidence we may consider, we turn to whether that evidence is sufficient to excuse the procedural default under *Martinez*. A state prisoner can overcome a procedural default if he can establish "cause" to excuse the procedural default and demonstrate that he suffered actual "prejudice" from the alleged error. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Under *Martinez*, "cause" exists where state law requires IAC claims be raised in collateral proceedings and there was "no counsel" or only "ineffective" counsel during the "initial-review" state collateral proceeding. 566 U.S. at 17. Prejudice exists where "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Id.* at 14.

Here, Ramirez has demonstrated "cause" to excuse his procedural default under *Martinez*. It is undisputed that Arizona law required IAC claims to be raised in collateral proceedings, *id.* at 6, and that Ramirez's counsel in the initial state collateral review proceeding was ineffective.

However, Ramirez has not demonstrated "prejudice." Under *Martinez,* a "substantial" IAC claim is one that has "some merit" under the standards of *Strickland v. Washington*, 466 U.S. 668 (1984). *Martinez*, 566 U.S. at 14. In order to satisfy the *Strickland* standard, the defendant is required to show "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense," *Strickland*, 466 U.S. at 687. In Ramirez's case, counsel's performance at sentencing was deficient, but, under recent Supreme Court and Ninth Circuit cases, Ramirez cannot establish that the deficiency sufficiently prejudiced his defense. Accordingly, Ramirez cannot "show prejudice from the procedural default because any ineffective assistance of counsel did not prejudice [him]." *See Lee v. Thornell*, 118 F.4th 969, 987 (9th Cir. 2024).

## A

We first consider *Strickland*'s deficient performance prong, which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." 466 U.S. at 687. Counsel's competence is presumed. *Id.* at 690. To show deficiency, a defendant must show that "counsel's representation fell below an objective standard of reasonableness" based on "prevailing professional norms" and was not the product of "sound trial strategy." *Id.* at 688–89 (citation omitted).

1

We begin with a review of sentencing counsel's performance. Sentencing counsel's primary argument for mitigation—that Ramirez excelled in the structured environment of prison—was undercut by the reality of his prison record, which included a prison escape and multiple disciplinary infractions.

Sentencing counsel did introduce some evidence suggesting that Ramirez had a troubled childhood and poor intelligence. She also introduced testimony from Ramirez's peer-aged aunt and two younger sisters during the mitigation hearing. The witnesses testified generally about Ramirez's positive qualities as a nephew and brother. The aunt testified that Ramirez's mother was an alcoholic who often left her children alone while she was out partying, leaving Ramirez at a young age in charge of his younger sisters. One of the sisters somewhat contradicted that account, testifying that she did not remember her mother having a drinking problem when the children were young. The aunt also testified that Ramirez was a "happy" child. Sentencing counsel shared Ramirez's school records, which revealed that Ramirez had changed schools ten times before the seventh grade, was chronically absent, had failing grades, and had received childhood IQ scores of 70 and 77.[4]

Finally, at sentencing counsel's request, the state trial court appointed Dr. Mickey McMahon to evaluate Ramirez's mental health. However, sentencing counsel did not share Ramirez's school records with Dr. McMahon. The

---

[4] Generally, an IQ test score of around 70 or as high as 75 indicates a significant limitation in intellectual functioning. AAIDD, *Intellectual Disability: Definition, Diagnosis, Classification, and Systems of Supports* (12th ed. 2021).

only background information sentencing counsel provided was Ramirez's criminal and prison records.

Dr. McMahon conducted a Peabody Picture Vocabulary Test ("PPVT"), on which Ramirez received a score of 94. Based on this result, Dr. McMahon found no indication of intellectual disability.  Instead, Dr. McMahon concluded that "the primary factor related to the murder was the abuse of alcohol and cocaine."   Dr. McMahon stated that this intoxication, in combination with Ramirez's fluid "ego boundaries," significantly diminished Ramirez's capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law.   Although Dr. McMahon noted some difficulties in Ramirez's childhood, including childhood sexual assault, he did not portray Ramirez's childhood as being generally traumatic.   Most notably, Dr. McMahon stated that Ramirez was raised by a "traditional Mexican-American mother whose responsibility revolves around the home and her children" and who "was always there for [Ramirez] when he needed her as he was growing up."     Sentencing counsel referenced Dr. McMahon's report extensively in her sentencing memorandum.

The evidence submitted and developed during Ramirez's state *Atkins* hearing contradicts some of Dr. McMahon's conclusions and contains additional details about Ramirez's upbringing.  Ramirez introduced reports and testimony from two psychological experts, who concluded that Ramirez met Arizona's statutory criteria for intellectual disability.  One of those psychologists also diagnosed Ramirez with significant frontal lobe brain dysfunction, the area of the brain that controls judgment and impulse control.  The State's two experts testified to their conclusions that Ramirez did not meet the statutory criteria of intellectually disabled.   In

addition to Ramirez's childhood IQ scores of 70 and 77, Ramirez took several full-scale IQ tests as an adult, on which he scored 70, 71, and 77.[5]

In a sworn declaration, Dr. McMahon stated that he normally requests school, vocational, and medical records, but does not recall being provided with any of these records in conducting his evaluation of Ramirez. Dr. McMahon also stated that had he been provided with Ramirez's school records at the time of sentencing, he would have insisted on obtaining information about Ramirez's adaptive behavior, given Ramirez a comprehensive IQ test (instead of the PPVT, which is not comprehensive),[6] retracted his statement that Ramirez's score did not indicate intellectual disability, and greatly expanded his evaluation.

Six family members who observed Ramirez's childhood also submitted declarations, which stated that they were not contacted during Ramirez's prior proceedings but would have been willing to testify on Ramirez's behalf. Several of these family members spoke with Ramirez's examining psychologists, and one testified during the hearing. This information reveals that Ramirez was exposed to multiple sources of potential brain damage as a fetus and infant. Most notably, Ramirez's family were migrant farm workers exposed to pesticides through air, a contaminated water

---

[5] Ramirez received one additional score of 87, but this score was skewed by the "practice effect" (i.e., Ramirez became a better test-taker, rather than more intelligent).

[6] The record contains extensive testimony and documents regarding the validity of the PPVT to assess intellectual functioning. In sum, the PPVT tests verbal intelligence. Although there may be some correlation between PPVT scores and IQ scores, a PPVT score is not a substitute for an IQ score.

supply, and unwashed produce.  Ramirez's mother worked in the fields while pregnant, and Ramirez joined her in the fields at a young age.  In addition, Ramirez's mother was an alcoholic who consumed alcohol while pregnant and fed baby Ramirez beer in a bottle "to keep him quiet and to put him to sleep."  Ramirez was also malnourished as a child. The family members and psychologists also spoke to Ramirez's adaptive deficits.  Family members described Ramirez as "slower" and "never right mentally."  Ramirez did not meet developmental milestones, including walking, talking, using the bathroom, bathing, eating with utensils, and tying his shoes.  He also exhibited bizarre behavior, such as "talking to himself or his pillow for hours."

The family members' accounts sharply contradict Dr. McMahon's characterization at sentencing of Ramirez's family as stable and his mother as devoted to her children. According to family members, Ramirez's mother "never wanted or loved" him because he was conceived through rape when she was only fourteen.  As a result, Ramirez was "shuttled" between family members and "[n]obody wanted him."  Ramirez's mother abandoned her children for days at a time to "party," during which time the children were left unsupervised and starving.  During one of these periods, Ramirez's infant sister died from cold exposure.  Ramirez's mother physically abused him, which may have resulted in head injuries.  She also exchanged sex for money and alcohol while Ramirez was in the room, and Ramirez witnessed the violent behavior of his mother's clients.  In addition, family members suspect that the family's landlord regularly molested Ramirez, which his mother tolerated because the landlord was "good" to the family.

2

Ramirez's sentencing counsel fell short of her obligation in multiple ways in investigating and presenting mitigating evidence at sentencing. Sentencing counsel abdicated her responsibility to (1) bring pertinent facts to the attention of the mental health expert examining Ramirez, and (2) adequately investigate compelling mitigation evidence. Taken together, those deficiencies fell below an objective standard of reasonableness based on the operative professional norms.

First, "[a] lawyer who knows of but does not inform his expert witnesses about [] essential pieces of information going to the heart of the case for mitigation does not function as 'counsel' under the Sixth Amendment . . . ." *Caro v. Calderon* ("*Caro I*"), 165 F.3d 1223, 1228 (9th Cir. 1999); *see also Rogers v. Dzurenda*, 25 F.4th 1171, 1187 (9th Cir. 2022) ("[T]he prevailing norms [in 1981] required counsel to give their competency experts everything [counsel] possibly could because [counsel would] want [the experts] to be prepared to render a reliable opinion." (citation modified)). During the guilt phase, attorneys may not be responsible for gathering background material for mental health experts in the absence of a specific request. *Murtishaw v. Woodford*, 255 F.3d 926, 945 (9th Cir. 2001) (citing *Hendricks v. Calderon*, 70 F.3d 1032, 1038 (9th Cir. 1995)). But "a defense attorney in the sentencing phase of a capital trial has 'a professional responsibility to investigate and bring to the attention of mental health experts who are examining his client[] facts that the experts do not request.'" *Hovey v. Ayers*, 458 F.3d 892, 925 (9th Cir. 2006) (alteration in original) (quoting *Wallace v. Stewart*, 184 F.3d 1112, 1116 (9th Cir. 1999)).

A failure to furnish relevant information to a mental health expert at the penalty phase, without any other fault by the lawyer, constitutes deficient performance. *See id.* at 925–26; *Wallace*, 184 F.3d at 1118. And in countless cases, we have held that deficient performance can be established from a combination of failing to furnish experts with information and failing to adequately investigate mitigation evidence. *See, e.g.*, *Rogers*, 25 F.4th at 1184–87; *Stanley v. Schriro*, 598 F.3d 612, 622–25 (9th Cir. 2010); *Douglas v. Woodford*, 316 F.3d 1079, 1088–89 (9th Cir. 2003); *Caro v. Woodford* ("*Caro II*"), 280 F.3d 1247, 1255 (9th Cir. 2002); *Caro I*, 165 F.3d at 1226–27; *Bean v. Calderon*, 163 F.3d 1073, 1079 (9th Cir. 1998); *Bloom v. Calderon*, 132 F.3d 1267, 1277–78 (9th Cir. 1997); *Clabourne v. Lewis*, 64 F.3d 1373, 1385 (9th Cir. 1995).

The exact information that a capital defense attorney must furnish to sentencing experts will vary based on what facts are relevant to the circumstances of the case. At a minimum, "[w]e think it is obvious that a psychiatrist's diagnosis . . . must necessarily rely heavily on the patient's past psychiatric history, family history, criminal activity, and medical records." *Rogers*, 25 F.4th at 1186 (quoting *Brown v. Sternes*, 304 F.3d 677, 696–97 (7th Cir. 2002)). If counsel is aware that the defendant may have been exposed to neurotoxins or experienced some other form of organic brain damage, such as a head injury, counsel must share that information with mental health experts. *See Caro I*, 165 F.3d at 1226–27. The extensive examples of flawed mental health evaluations in our caselaw demonstrate why facilitating the accuracy of such evaluations is an essential duty of defense counsel. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 392 (2005) (describing medical experts as unable to find mitigating evidence because they were not provided

relevant records); *Wallace*, 184 F.3d at 1115 (discussing inaccuracies in uninformed expert's report); *Bloom*, 132 F.3d at 1277 (explaining that "a hurried and inaccurate report resulted" from the failure to prepare an expert).

Here, the only information Dr. McMahon had at sentencing about Ramirez was his prior criminal activity. *See Wallace*, 184 F.3d at 1115, 1118 (finding a prima facie case of IAC where the expert was only provided with police reports and the misinformed testimony of a prior expert). Sentencing counsel knew that Ramirez had IQ scores of 70 and 77 and shockingly poor grades, and she had observed his peculiar behavior firsthand. Sentencing counsel shared none of this information with Dr. McMahon. Dr. McMahon said himself that he typically requests background records and would have liked to interview Ramirez's family members, and that his resulting report was not as detailed as he would have liked. Lacking this necessary background material, Dr. McMahon prepared a report that was beyond "flawed." *See id.* at 1115. Dr. McMahon chose not to administer a comprehensive IQ test, and his characterization of Ramirez's family life was inaccurate. In sum, sentencing counsel acted unreasonably in failing to provide Dr. McMahon with relevant information.

Second, "[f]ailure to present mitigating evidence at the penalty phase of a capital case constitutes ineffective assistance of counsel." *Bean*, 163 F.3d at 1079. "It is unquestioned that under the prevailing professional norms at the time of [Ramirez's] trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'" *Porter v. McCollum*, 558 U.S. 30, 39 (2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000)). An adequate investigation includes inquiries into social background, evidence of family abuse, evidence of mental

impairment, and evidence of potential organic brain damage and other disorders. *Summerlin v. Schriro*, 427 F.3d 623, 630 (9th Cir. 2005). Failing to pursue these avenues of investigation constitutes deficient performance unless counsel "make[s] a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.

Counsel's duty is not to conduct *some* investigation, but to investigate "thoroughly" and "adequately." *See Wiggins v. Smith*, 539 U.S. 510, 526 (2003); *Williams*, 529 U.S. at 396; *Douglas*, 316 F.3d at 1087–89; *Bean*, 163 F.3d at 1080. Counsel's duty "is not discharged merely by conducting a limited investigation of these issues or by providing the sentencing court with a cursory or 'abbreviated' presentation of potentially mitigating factors." *Lambright v. Schriro*, 490 F.3d 1103, 1120 (9th Cir. 2007) (gathering cases). Even if counsel presents and the sentencing court finds some mitigating circumstances, "we have consistently held that 'it is imperative that *all* relevant mitigating information be unearthed for consideration at the capital sentencing phase.'" *Id.* at 1116–17 (emphasis added) (quoting *Wallace*, 184 F.3d at 1117).

In *Douglas*, for example, we held that "although [counsel] did perform some investigation, it was constitutionally inadequate." *Douglas*, 316 F.3d at 1089. Several family members testified to the defendant's good character and difficult childhood, including that the defendant was orphaned, poor, and possibly malnourished as a child. *Id.* at 1084, 1087–88. Rather than satisfying the duty to investigate, that information "revealed the need to dig deeper." *Id.* at 1089. A deeper dig would have uncovered a more detailed account of the defendant's horrific childhood, as well as evidence of possible brain damage. *Id.* at 1087–88.

The facts of the case at hand and those in *Douglas* are strikingly similar. Ramirez's sentencing counsel introduced the testimony of three family members, but their testimony did not detail Ramirez's adaptive deficits or childhood abuse. Furthermore, sentencing counsel's choice of witnesses is particularly troubling. All three witnesses were children themselves during the events in question, compromising their ability to remember and process Ramirez's disturbing childhood. Two of the witnesses may themselves have had intellectual disabilities, and the third may have been the same aunt who allegedly sexually assaulted Ramirez as a child. Sentencing counsel could have easily contacted more appropriate witnesses, given that six more suitable witnesses have signed declarations saying they would have willingly provided information about Ramirez's childhood and testified on his behalf, yet sentencing counsel never contacted them. *See Wallace*, 184 F.3d at 1116 (noting that mitigating information was "easily within [counsel's] reach" when three family members had "signed affidavits saying they would have willingly provided information about [defendant's] childhood and testified on his behalf, yet [counsel] never contacted them."). Sentencing counsel's questioning was also unlikely to elicit testimony relevant to mitigation, given that sentencing counsel did not ask any questions about developmental delays or childhood abuse. Instead, sentencing counsel asked questions like "is there any reason why your brother would not love you or other family members?" and "do you think your brother should receive the death penalty?" In addition, sentencing counsel failed to discover readily-available evidence of Ramirez's potential brain damage and intellectual disability.

Of course, the "duty to investigate is not limitless." *Douglas*, 316 F.3d at 1088. "[C]ounsel is not deficient for failing to find mitigating evidence if, after a reasonable investigation, nothing has put the counsel on notice of the existence of that evidence." *Id.* (alteration in original) (quoting *Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998)). But "when 'tantalizing indications in the record' suggest that certain mitigating evidence may be available, those leads must be pursued." *Lambright*, 490 F.3d at 1117 (quoting *Stankewitz v. Woodford*, 365 F.3d 706, 719–20 (9th Cir. 2004)). Here, sentencing counsel's knowledge of Ramirez's low IQ scores, poor academic performance, and inappropriate behavior put her on notice that more investigation was required, not less.

Contrary to the State's assertions, Dr. McMahon's report did not foreclose further investigation. While Dr. McMahon did not find evidence of intellectual disability, he entertained the possibility that Ramirez had schizophrenia, noted other indicia of mental illness, and offered some evidence of Ramirez's childhood trauma. Furthermore, counsel may not rely on an expert report that is objectively unreasonable. It is not reasonable to rely on an uninformed expert. *Cf. Lee*, 118 F.4th at 986 (holding that it was reasonable for counsel to rely on expert's conclusion that petitioner did not have Fetal Alcohol Syndrome because counsel "provided [the expert] with his suspicions about [the petitioner's] fetal alcohol exposure"); *Sims v. Brown,* 425 F.3d 560, 586 (9th Cir. 2005) (holding that counsel who "retained and *informed* well-qualified experts upon whom he could reasonably rely" was not deficient (emphasis added)). There were additional indications that Dr. McMahon's report was not objectively reasonable—Dr. McMahon's PPVT score was a glaring anomaly, and his description of Ramirez's family life

appears to be based solely on his stereotypes about the "traditional Mexican-American family." In these circumstances, it was not reasonable for sentencing counsel to cease investigation based on Dr. McMahon's conclusions.

Sentencing counsel's "'failure to uncover and present [the] voluminous mitigating evidence,' moreover, cannot 'be justified as a tactical decision.'" *Andrus v. Texas*, 590 U.S. 806, 816 (2020) (alteration in original) (quoting *Wiggins*, 539 U.S. at 522). Sentencing counsel abandoned her investigation when it had barely begun, "making a fully informed decision with respect to sentencing strategy impossible." *Wiggins*, 539 U.S. at 527–28.

Sentencing counsel had no excuse for failing to adequately investigate the mitigating evidence in Ramirez's case. Ramirez was less than helpful in preparing his mitigation defense, but a client's noncooperation or reluctance to involve family members does not foreclose an attorney's duty to investigate. *See Summerlin*, 427 F.3d at 636–39; *Silva v. Woodford*, 279 F.3d 825, 840 (9th Cir. 2002). "[A] lawyer who abandons investigation into mitigating evidence in a capital case at the direction of his client must at least have adequately informed his client of the potential consequences of that decision and must be assured that his client has made 'informed and knowing' judgment." *Silva*, 279 F.3d at 838 (quoting *Jeffries v. Blodgett*, 5 F.3d 1180, 1198 (9th Cir. 1993)). Ramirez was uncooperative, but there is no evidence suggesting that Ramirez directed sentencing counsel to abandon his mitigation defense, let alone in an "informed and knowing manner." *See id.* Moreover, because sentencing counsel skimped on investigation, Ramirez lacked the information needed to make an informed decision. *See Douglas*, 316 F.3d at 1089–90. Absent an "informed and knowing"

directive from Ramirez, sentencing counsel's "duty to investigate [wa]s virtually absolute, regardless of [Ramirez's] expressed wishes." *See Silva*, 279 F.3d at 840.

Procrastination is also no excuse for inadequate investigation. The State argues that sentencing counsel had limited time between Ramirez's conviction and sentencing to prepare Ramirez's mitigation defense. At the time of Ramirez's trial, prevailing professional norms dictated that preparation for the penalty phase of a capital trial "should begin *immediately upon counsel's entry into the case*." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, Guideline 11.4.1(A), p. 13 (1989) (emphasis added); *see also Williams*, 529 U.S. at 395 (faulting counsel for failing to begin preparing for the penalty phase until a week before trial); *Allen v. Woodford*, 395 F.3d 979, 1001 (9th Cir. 2005) ("If the life investigation awaits the guilt verdict, it will be too late.").

For these reasons, we conclude that Ramirez has satisfied *Strickland*'s deficient performance prong.

B

We now turn to *Strickland*'s second prong—whether sentencing counsel's deficient performance prejudiced Ramirez. *See Strickland*, 466 U.S. at 692. When counsel performs deficiently at capital sentencing, prejudice exists if "there is a reasonable probability that, absent [counsel's] errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695. "A reasonable probability is a probability sufficient to undermine confidence in the outcome. That requires a

substantial, not just conceivable, likelihood of a different result." *Cullen*, 563 U.S. at 189 (citation modified).

In our prior decision, we held that Ramirez satisfied *Strickland*'s prejudice prong based on evidence submitted to the district court, which overlaps considerably with the *Atkins* record that we consider now. *See Ramirez I*, 937 F.3d at 1245–47. However, since our prior decision, the Supreme Court decided *Thornell v. Jones*, 602 U.S. 154 (2024), which held that the prejudice analysis "requires an evaluation of the strength of all the evidence and a comparison of the weight of aggravating and mitigating factors." *Id*. at 171–72. In addition, our Court decided *Lee*, which suggests that the omission of evidence of a mental impairment is not prejudicial when that evidence is presented only to bolster the impression of the defendant already developed at sentencing. *Lee*, 118 F.4th at 988–89. Under the standards for prejudice articulated in *Jones* and *Lee*, sentencing counsel's deficient performance did not prejudice Ramirez.

1

We begin with the mitigating evidence: new intellectual disability and brain dysfunction diagnoses and additional social history. While there is no set formula for determining which evidence could reasonably have affected the sentencing outcome, evidence that would "barely have altered the sentencing profile," or "would not carry much weight in Arizona courts" is unlikely to do so. *See Jones*, 602 U.S. at 165–66 (quoting *Strickland*, 466 U.S. at 700). Ramirez's new mitigating evidence suffers from both deficits.

Ramirez's new diagnostic evidence would have offered a different explanation for something the sentencing judge already knew: that at the time of the crime Ramirez had

diminished capacity to control his conduct. Ramirez's sentencing counsel "already put on evidence to build on th[e] themes" of diminished impulse control and judgment, including evidence of Ramirez's low IQ. *Lee*, 118 F.4th at 988. Also, counsel presented Dr. McMahon's report detailing Ramirez's drug use and fluid "ego boundaries." The sentencing judge relied on this report to conclude that Ramirez's "capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law was significantly impaired," a statutory mitigating factor. *State v. Ramirez*, 871 P.2d at 252 (citing A.R.S. § 13–703(G)(1)).

Ramirez argues that his new explanation for his diminished capacity—intellectual disability and brain damage—is more sympathetic than the prior explanation, which focused primarily on drug use. But *Lee* held that a change in the explanation for an already established characteristic of the defendant is unlikely to suffice in creating a reasonable probability of a different outcome. *Lee*, 118 F.4th at 989. In *Lee*, sentencing counsel had introduced the results of petitioner's personality tests and an expert's assessment of the petitioner, all of which contributed to the impression of the petitioner as highly suggestible. *Id*. at 977, 988. Later, the petitioner brought in new evidence of Fetal Alcohol Syndrome to explain his suggestibility. *Id*. at 979. We held that this new evidence of an explanation for the petitioner's suggestibility did not establish prejudice for IAC purposes. *Id.* at 989.

Here, the sentencing judge accepted that Ramirez had diminished capacity to control his conduct, yet he sentenced Ramirez to death anyway. Different evidence of the already-accepted characteristic did not alone create a "substantial . . . likelihood of a different result," *Cullen*, 563

U.S. at 189 (citation and internal quotation marks omitted), and is likely to be accorded little weight.

Moreover, even if Ramirez's new diagnostic evidence could in some circumstances have materially amplified the diminished capacity mitigation factor, a review of Arizona case law leads to the conclusion that the evidence itself "would not carry much weight in Arizona courts," as it was not connected to the reasons for the crime. *Jones*, 602 U.S. at 165. Although "mental defects have been respected as a reason for leniency," *Caro II*, 280 F.3d at 1258 (citing 4 William Blackstone, Commentaries on the Laws of England 24–25 (1769)), Arizona courts accord such evidence diminished persuasiveness when the petitioner has not established a causal connection between the mental impairment and the criminal conduct, *see Jones*, 602 U.S. at 166–67 (gathering cases). Of course, Arizona courts may not preclude the presentation of such evidence. *See Tennard v. Dretke*, 542 U.S. 274, 283–87 (2004); *Smith v. Texas*, 543 U.S. 37, 45 (2004) (per curiam); *see also Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982) (holding that a sentencer may not "refuse to consider, as a matter of law, any relevant mitigating evidence."). However, lack of a causal nexus between the mitigating factor and the crime may be considered "as a factor in determining the weight or significance of mitigating evidence." *Poyson v. Ryan*, 879 F.3d 875, 888 (9th Cir. 2018) (citations omitted).

Because Ramirez has not established a causal connection between the mitigating factors and the crime, the factors are entitled to diminished weight. One expert explained that Ramirez has brain dysfunction in the frontal lobe region, which controls judgment and impulse control. But the expert did not directly connect this lack of judgment and impulse control to Ramirez's crime. *See id.* ("Because none of

[petitioner's] experts provided a real link between [his] disorders and the murders, their testimony would have done him little good in the Arizona courts."). Based on Arizona's causal connection precedents, it is unlikely that an Arizona court would vacate Ramirez's death sentence based on evidence of intellectual or other mental disability unlinked to the murders or accord such evidence significant weight as a mitigator.

The State would have us entirely discount Ramirez's evidence of intellectual disability based on the outcome of Ramirez's *Atkins* proceeding, in which the state court concluded that Ramirez did not meet the statutory definition of intellectually disabled. However, evidence of mental impairment is relevant to the penalty phase of a capital case even if it does not satisfy the statutory definition of intellectual disability. *See Doe v. Ayers*, 782 F.3d 425, 441 (9th Cir. 2015) ("[M]ental problems may help even if they don't rise to a specific, technically-defined level." (citation omitted)). The State is correct that the prejudice determination "necessarily requires an evaluation of the strength of" the new evidence. *Jones*, 602 U.S. at 164. But, unlike the uncorroborated evidence discussed in *Jones*, *see id.* at 168–69, Ramirez's two intellectual disability diagnoses corroborate each other and are credible. Ramirez's two experts were well-credentialed and administered the proper tests for assessing IQ and adaptive deficits. And because the State's experts were less experienced in assessing intellectual disability and made a number of methodological errors, their contradictory assessments carry less weight.[7] Thus, the reason the

---

[7] One of the State's experts admitted that he did not specialize in intellectual disability; the other admitted he had only administered the

omission of Ramirez's diagnostic evidence is nonprejudicial is not because the evidence itself was weak. Rather, the omission is non-prejudicial because there is little probability that Ramirez's intellectual disability, unlinked to his criminal conduct, would change the mind of a sentencer who already knew that Ramirez had diminished capacity.

Ramirez's new social history information suffers from the same deficits as his diagnostic evidence. Had counsel performed effectively, the sentencing judge would have seen a more compelling and consistent picture of Ramirez's horrific childhood, which was plagued by abuse, malnutrition, and neglect. But these themes were already explored at the sentencing hearing, *see Lee*, 118 F.4th at 988, albeit without many of the excruciating details. Because the sentencing judge already recognized that Ramirez had an "unstable family background" and "was the victim of sexual abuse while he was young," *State v. Ramirez*, 871 P.2d at 252, Ramirez's new social history information would not have significantly altered his sentencing profile.

Furthermore, a review of Arizona decisions indicates that Ramirez's childhood trauma would likely be accorded diminished weight in an Arizona court. *See Jones*, 602 U.S. at 165. In Arizona, the mitigating weight of childhood abuse "depends on the age of the defendant at the time of the murder and the causal connection between the abuse and crime committed." *See State v. Poyson*, 475 P.3d 293, 300 (Ariz. 2020). Ramirez's childhood trauma would be entitled to less weight because Ramirez was thirty-two years old at

---

adaptive behavior test one other time. Their methodological errors included incorrectly administering adaptive behavior tests, relying solely on self-reporting, and failing to account for the "practice effect" in assessing IQ.

the time of the crime, and because he did not tie his upbringing to his criminal conduct, either at sentencing or in the state habeas record. *See State v. Hampton*, 140 P.3d 950, 968 (Ariz. 2006) (en banc) (holding that the petitioner's troubled upbringing was entitled to less weight because the petitioner "was thirty years old when he committed his crimes" and "ha[d] not tied [his childhood] to his murderous behavior"); *see also Jones*, 602 U.S. at 169 (holding that childhood abuse allegations were weakened by the fact that they were "not causally connected to the murders").

## 2

On the other side of the scale, the aggravating evidence was more than substantial enough to outweigh the likely weak impact of the additional mitigation evidence that should have been introduced at trial. Pursuant to the Supreme Court's recent pronouncement in *Jones*, we must accord the aggravating factors "the weight that they would . . . be accorded by an Arizona sentencing judge." 602 U.S. at 164. Here, the sentencing judge identified three aggravating factors: multiple homicides, cruelty, and prior violent felony convictions. *State v. Ramirez*, 871 P.2d at 242. Arizona accords the multiple-homicides factor "extraordinary weight" and considers the cruelty aggravator "particularly weighty." *Jones*, 602 U.S. at 170 (quoting *State v. Garza*, 163 P.3d 1006, 1022 (Ariz. 2007) and *Poyson*, 475 P.3d at 302).

In *Jones*, the Court noted that the petitioner's inability to identify an Arizona Supreme Court case vacating a death sentence involving identical aggravators "strongly suggests that [the petitioner] has no reasonable probability of escaping the death penalty." *Id.* at 1314. Ramirez, too, is unable to identify any analogous Arizona Supreme Court

case. The closest analog is *State v. Stuard*, 863 P.2d 881 (Ariz. 1993) (en banc), in which the Arizona Supreme Court vacated a death sentence involving the multiple-homicides and prior-conviction aggravators based on the sentencing judge's erroneous conclusion that the petitioner did not have any mental impairment. *Id.* at 896–97, 901–02. There are two crucial differences between *Stuard* and this case. First, *Stuard* did not involve the cruelty aggravator. *Id.* at 896–97. Second, and most importantly, *Stuard* involved much stronger mitigation evidence of mental impairment, including a causal connection to the crime. *Id.* at 900 ("With only minor variations in theme and certainty, all three experts agreed that Defendant was mentally impaired at the time of the murders and that this impairment contributed to the homicides.").

Federal caselaw is no more helpful to Ramirez. In *Jones*, the Court distinguished many of the cases that Ramirez now relies on because they involved less mitigating evidence at the original sentencing and only one or two aggravating circumstances. *Jones*, 602 U.S. at 171 (distinguishing *Porter*, *Williams*, *Rompilla*, and *Wiggins*). The closest analog is *Smith v. Stewart*, 189 F.3d 1004 (9th Cir. 1999), in which we vacated a death sentence involving all of the aggravating factors present here based on new evidence of mental illness and social history. 189 F.3d at 1012–14. But there, the case was "more akin to those situations in which defense counsel failed to present any mitigating evidence at all." *Id.* at 1008. Furthermore, when the case returned to the Arizona courts for resentencing, the petitioner was again sentenced to death. *State v. Smith*, 159 P.3d 531, 544–45 (Ariz. 2007) (en banc).

We do not foreclose the possibility that a different defendant with the same number and combination of

aggravating circumstances as Ramirez could present mitigating evidence warranting leniency. No matter how horrific the crime, the sentencer must treat the defendant as a "uniquely individual human being[]." *See Woodson v. North Carolina*, 428 U.S. 280, 304 (1976). Considering the particularized record in Ramirez's case, and with the application of the standard announced by the Supreme Court in *Jones* and applied by this court in *Lee*, we conclude that the new mitigation evidence is not powerful enough to overcome the extremely weighty aggravating circumstances. Accordingly, we hold that sentencing counsel's deficient performance did not prejudice Ramirez's defense within the meaning of *Strickland*.

IV

For the foregoing reasons, we affirm the district court's judgment denying a writ of habeas corpus.

**AFFIRMED.**

---

BERZON, Circuit Judge, dissenting in part:

I concur in the opinion except in one respect: I would grant a certificate of appealability with regard to Ramirez's claim under *Atkins v. Virginia*, 536 U.S. 304 (2002), hold that the claim relates back to Ramirez's ineffective assistance of counsel claim, and remand to the district court for further proceedings. For the reasons explained in my partial dissent to our prior decision, *Ramirez v. Ryan*, 937 F.3d 1230, 1251–54 (9th Cir. 2019) (Berzon, J., dissenting in part), I believe that Ramirez is entitled to a certificate of appealability on his *Atkins* claim and that the district court

abused its discretion in holding that his *Atkins* claim does not relate back to his timely filed habeas petition.